## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOHNATHAN AND TRUDE YARGER, a
married couple,

          Plaintiffs,

      v.

ING BANK, FSB D/B/A/ ING DIRECT,

        Defendant.

Civil Action No.: 1:11-cv-00154-LPS

**REDACTED VERSION**

### OPENING BRIEF IN SUPPORT OF PLAINTIFFS'
### MOTION FOR CLASS CERTIFICATION

Jonathan D. Selbin
jselbin@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Daniel R. Leathers
dleathers@lchb.com
250 Hudson Street, 8th Floor
New York, New York 10013-1413

Daniel M. Hutchinson
dhutchinson@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339

David P. Meyer
dmeyer@dmlaws.com
Matthew R. Wilson
mwilson@dmlaws.com
DAVID P. MEYER & ASSOCIATES, CO.,
LPA
1320 Dublin Road, Ste. 100, Columbus, Ohio
43215

Jeffrey S. Goddess  (Del. Bar No. 630)
jgoddess@rmgglaw.com
P. Bradford deLeeuw  (Del Bar No. 3569)
bdeleeuw@rmgglaw.com
ROSENTHAL, MONHAIT & GODDESS,
P.A.
919 Market Street, Suite 1401
Wilmington, Delaware 19899-1070

# TABLE OF CONTENTS

**Page**

OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
    CERTIFICATION .................................................................................................. 0

I.      INTRODUCTION ......................................................................................... 1

II.    NATURE AND STAGE OF THE PROCEEDINGS ................................... 3

III.   SUMMARY OF ARGUMENT ................................................................... 3

IV.   STATEMENT OF FACTS ........................................................................... 3

      A.     ING's Uniform Orange and Easy Orange Loans. ........................... 3

      B.     ING's Rate Renew Feature. ............................................................. 4

      C.     ING's Uniform Rate Renew Advertising. ...................................... 4

             1.     Written $500 Rate Renew Guarantees. ............................... 5

             2.     Written $750 Rate Renew Guarantees. ............................... 6

      D.     ING's Knowledge and Intent that Customers Would Rely on Its
            Rate Renew Advertising. ................................................................. 7

      E.     ING's Decision Not To Honor Its Rate Renew Guarantee. ............ 9

             1.     Pricing. ................................................................................ 9

             2.     Qualification "Requirements" ............................................. 10

      F.     Customers' Uniform Complaints that ING Refuses to Honor Its
            Rate Renew Guarantee. .................................................................. 11

V.     LEGAL STANDARD ................................................................................ 12

VI.   THE PROPOSED CLASS SATISFIES RULE 23. .................................. 13

      A.     Plaintiffs Satisfy The Four Requirements Of Rule 23(a). ........... 13

             1.     The Class Is Sufficiently Numerous. ................................. 13

             2.     There Are Common Questions Of Fact and Law ............... 14

             3.     Plaintiffs' Claims Are Typical Of The Class' Claims ........ 15

             4.     Plaintiffs Will Adequately Represent The Class ............... 16

      B.     Certification Is Proper Under Both Rule 23(b)(2) and Rule
            23(b)(3) .......................................................................................... 17

             1.     Certification Under Rule 23(b)(2) Is Appropriate. ........... 17

             2.     Certification Under Rule 23(b)(3) Is Appropriate. ........... 18

                  a.     Common Questions of Law and Fact Predominate. ........ 18

**TABLE OF CONTENTS**
**(continued)**

Page

i.     Delaware Law Applies..........................................20

ii.    DCFA Claim. .......................................................22

iii.   Common Law Fraud Claim. ...............................24

iv.   Promissory Estoppel Claim.................................25

v.     Breach of Implied Covenant of Good Faith
      and Fair Dealing Claims. .....................................26

vi.   Unjust Enrichment Claim. ..................................26

vii.   Damages for All Claims.......................................26

b.     A Class Action Is a Superior Method for the Fair
      and Efficient Adjudication of This Controversy..............27

VII.   APPOINTMENT OF CLASS COUNSEL ...........................................30

VIII.   CONCLUSION....................................................................................30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allstate Ins. Co. v. Hague,*
  449 U.S. 302 (1981)............................................................................................... 22

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997)............................................................................... 2, 13, 19, 21

*Ayers v. Quillen,*
  2004 WL 1965866 (Del. Super. Ct. June 30, 2004) ................................................ 23

*Baby Neal for & by Kanter v. Casey,*
  43 F.3d 48 (3d Cir. 1994) ....................................................................................... 18

*Baby Neal v. Casey,*
  43 F.3d 48 (3d Cir. 1994) ....................................................................................... 16

*Barnes v. Am. Tobacco Co.,*
  161 F.3d 127 (3d Cir. 1998) ................................................................................... 18

*Borish v. Graham,*
  655 A.2d 831 (Del. 1994) ....................................................................................... 26

*Cannon v. Cherry Hill Toyota,*
  184 F.R.D. 540 (D.N.J. 1999).................................................................................. 14

*Chiang v. Veneman,*
  385 F.3d 256 (3d Cir. 2004) ......................................................................... 14, 19, 24

*City of Roseville Employees Ret. Sys. v. Horizon Lines, Inc.,*
  713 F. Supp. 2d 378 (D. Del. 2010)......................................................................... 25

*Dal Ponte v. American Mortgage Express Corp.,*
  2006 WL 2403982 (D.N.J. Aug. 17, 2006) .......................................................... 22, 30

*Eames v. Nationwide Mut. Ins. Co.,*
  412 F. Supp. 2d 431 (D. Del. 2006).......................................................................... 23

*Easton & Co. v. Mutual Benefit Life Ins. Co.,*
  1993 WL 89146 (D.N.J. Feb. 9, 1992) ...................................................................... 26

954800.4

## TABLE OF AUTHORITIES
### (continued)

Page

*Eisenberg v. Gagnon*,
766 F.2d 770 (3d Cir. 1985) ............................................................................................... 13, 16, 26

*Elias v. Ungar's Food Prods.*,
252 F.R.D. 233 (D.N.J. 2008) ......................................................................................................... 22, 24

*Gaffin v. Teledyne, Inc.*,
611 A.2d 467 (Del. 1992) ......................................................................................................... 25

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981) ......................................................................................................... 13

*Hassine v. Jeffes*,
846 F.2d 169 (3d Cir. 1988) ......................................................................................................... 16

*In re Brandywine Volkswagen, Ltd.*,
306 A.2d 24 (Del. Super. 1973), *aff'd* 312 A.2d 632 (Del. 1973) ............................................. 23

*In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*,
2006 WL 891362 (D.N.J. Apr. 4, 2006) ..................................................................................... 17

*In re Community Bank of N. Va.*,
418 F.3d 277 (3d Cir. 2005) ......................................................................................................... 29

*In re Constar Int'l Inc. Sec. Litig.*,
585 F.3d 774 (3d Cir. 2009) ......................................................................................................... 13

*In re Honeywell Int'l Inc. Sec. Litig.*,
211 F.R.D. 255 (D.N.J. 2002) ......................................................................................................... 14

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ......................................................................................................... 13

*In re Ins. Broker Antitrust Litig.*,
579 F.3d 241 (3d Cir. 2009) ......................................................................................................... 19

*In re Lucent Techs., Inc. Sec. Litig.*,
307 F. Supp. 2d 633 (D.N.J. 2004) ......................................................................................................... 16

*In re Mercedes-Benz Antitrust Litig.*,
213 F.R.D. 180 (D.N.J. 2003) ......................................................................................................... 16, 19, 28

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Mercedes-Benz Tele Aid Contract Litig.*,
  257 F.R.D. 46 (D.N.J. 2009) ("*Tele Aid*") .......................................................................... passim

*In re ML-Lee Acquisition Fund II, L.P.*,
  848 F. Supp. 527 (D. Del. 1994) .................................................................................... 3, 22

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ...................................................................................... 14

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) ............................................................................................. 16

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  962 F. Supp. 450 (D.N.J. 1997) ................................................................................... 13, 28

*In re Tyson Foods, Inc. Secs. Litig.*,
  2003 WL 22316548 (D. Del. Oct. 6, 2003) ................................................................... 17

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ....................................................................................... passim

*In re Wellbutrin SR Direct Purchaser Litig.*,
  2008 U.S. Dist. LEXIS 36719 (E.D. Pa. May 2, 2008) .................................................. 13

*Johnson v. GEICO Cas. Co.*,
  673 F. Supp. 2d 255 (D. Del. 2009) ............................................................. 3, 22, 23, 24

*Kline v. Sec. Guards, Inc.*,
  196 F.R.D. 261 (E.D. Pa. 2000) ...................................................................................... 13

*Lony v. E.I. du Pont de Nemours & Co., Inc.*,
  821 F. Supp. 956 (D. Del. 1993) .................................................................................... 22

*M.A. Ex rel. E.S. v. Newark Public Schools*,
  2009 WL 4799291 (D.N.J. Dec. 7, 2009) ...................................................................... 18

*Nafar v. Hollywood Tanning Sys., Inc.*,
  2008 WL 3821776 (D.N.J. Aug. 12, 2008) ............................................................ 22, 25, 29

*Nash v. Hoopes*,
  332 A.2d 411 (Del. Super. 1975) .................................................................................... 23

954800.4

# TABLE OF AUTHORITIES
## (continued)

Page

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
259 F.3d 154 (3d Cir. 2001) .................................................................................................... 16

*O'Keefe v. Mercedes-Benz USA, LLC,*
214 F.R.D. 266 (E.D. Pa. 2003)............................................................................................... 30

*Perry v. FleetBoston Fin. Corp.,*
229 F.R.D. 105 (E.D. Pa. 2005)............................................................................................... 24

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 628 (1987)......................................................... 22, 29

*S&R Assocs., L.P., III v. Shell Oil Co.,*
725 A.2d 431 (Del. Super. Ct. 1998) ....................................................................................... 23

*Slapikas v. First American Title Ins. Co.,*
250 F.R.D. 232 (W.D. Pa. 2008) ............................................................................................. 27

*Spark v. MBNA Corp.,*
178 F.R.D. 431 (D. Del. 1998) ................................................................................................ 26

*Stephenson v. Capano Dev., Inc.,*
462 A.2d 1069 (Del. 1983)....................................................................................................... 23

*Stewart v. Abraham,*
275 F.3d 220 (3d Cir. 2001) ........................................................................................ 14, 15, 16

*Sullivan v. DB Invs., Inc.,*
__ F.3d __, 2011 U.S. App. LEXIS 25185 (3d Cir. N.J. Dec. 20, 2011) ......................... passim

*United Steelworkers v. ConocoPhillips Co.,*
593 F.3d at 802 (9th Cir. 2010) ............................................................................................... 30

*Varacallo v. Mut. Life Ins. Co.,*
226 F.R.D. 207 (D.N.J. 2005).......................................................................................... 19, 24

*Wal-Mart Stores Inc. v. Dukes,*
131 S. Ct. 2541 (2011).............................................................................................................. 14

*Wilson v. County of Gloucester,*
256 F.R.D. 479 (D.N.J. 2009)................................................................................................... 18

## TABLE OF AUTHORITIES
### (continued)

Page

*Young v. Joyce,*
  351 A.2d 857 (Del. 1975) ........................................................................................................... 23

### STATUTES

6 Del. C. §§ 2511 *et seq.* .............................................................................................................. 1

6 Del. C. § 2511(1) ....................................................................................................................... 23

6 Del. C. § 2512 ..................................................................................................................... 18, 22

6 Del. C. § 2513 ........................................................................................................................... 22

DEL. P.J.I. CIV. § 16.1 (2000) ....................................................................................................... 24

DEL. P.J.I. CIV. § 16.5 (2000) ....................................................................................................... 23

DEL. P.J.I. CIV. § 19.14 (2000) ..................................................................................................... 25

### RULES

Advisory Comm.'s Notes on Fed. R. Civ. P. 23, 28 U.S.C. App. ................................................. 12

Fed. R. Civ. P. 1 .......................................................................................................................... 27

Fed. R. Civ. P. 23(a)(3) ............................................................................................................... 15

Fed. R. Civ. P. 23(b)(2) ............................................................................................................... 17

Fed. R. Civ. P. 23(b)(3) .......................................................................................................... 18, 27

Fed. R. Civ. P. 23(g)(1) ............................................................................................................... 30

### TREATISES

Charles A. Wright, *et al.*, 7A *Federal Practice and Procedure*
  § 1751 (3d ed. 2005) ................................................................................................................. 12

Wright & Miller, *Federal Practice and Procedure* § 1780 .......................................................... 29

Plaintiffs respectfully submit this brief in support of Class certification.

## I.   INTRODUCTION

Plaintiffs bring this consumer protection case against ING Bank, fsb ("ING") for its uniform fraudulent marketing of its Rate Renew guarantee ("Rate Renew") to Plaintiffs and tens of thousands of borrowers like them. ING's Rate Renew guarantee promised customers the ability to "reset" their mortgage at the then-current interest rate for a low fixed price at any time during the life of the loan. From October 2005 through May 2008, ING advertised its Rate Renew as having a guaranteed, fixed price of $500. From May 2008 through May 2009, ING advertised its Rate Renew with a guaranteed, fixed price of $750. Having thereby induced customers to purchase or retain their home mortgages, ING refused to honor its promise, and instead has required customers to pay much higher fees and meet undisclosed qualifications to receive the Rate Renew.

This case involves a classic "bait and switch" scheme. ING promised customers one thing—the ability to do a Rate Renew at a low fixed price for the life of their loan—and then delivered something much less—a Rate Renew at a much higher cost and/or with undisclosed qualifications. ING's scheme is all the more egregious because it has held itself out to borrowers as a bank that does not employ hidden fees, while at the same time manipulating its Rate Renew fee to increase its bottom line—to the tune of tens of millions of dollars a year—by doing just that. Plaintiffs bring this case on behalf of themselves and all those like them who purchased a home mortgage from ING with a Rate Renew the terms of which ING refused and refuses to honor. They bring claims for violation of the Delaware Consumer Fraud Act, 6 Del. C. §§ 2511 *et seq.* ("DCFA"), fraud, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.

Few cases are as well-suited for class treatment as this one. Both the Supreme Court and Third Circuit have held that the requirements for class certification are "readily met" in consumer fraud cases where common factual questions necessarily center upon the defendant's course of conduct. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Sullivan v. DB Invs., Inc.*, __ F.3d __, 2011 U.S. App. LEXIS 25185, at *45-46, 51-52 (3d Cir. N.J. Dec. 20, 2011) (*en banc*); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) ("*Warfarin*"). This case is the very embodiment of those holdings. As detailed below, it involves consumer fraud claims against a single defendant (with no intermediary) arising from uniform written representations ING made over a four-year period to an identifiable group of customers for the express purpose of inducing them to purchase or retain ING home mortgages. All claims arise from and focus on ING's conduct, i.e. its decision to implement the Rate Renew program, its advertising of that program in uniform written materials, and its decision not to honor the terms of the Rate Renew. It also involves application of a single state's law— Delaware—both by operation of the applicable choice-of-law rules and, more importantly, because ING imposed a uniform choice-of-law and forum clause on every Class member.

Certification of the proposed class pursuant to Fed. R. Civ. P. 23 would further the Rule's dual goals of efficiency and fairness. These claims involve overwhelmingly common questions of law and fact. These issues ought only be adjudicated once, in a single proceeding, rather than over and over in tens of thousands of individual trials on literally identical evidence of what ING said and did. Without class certification, these claims would never be heard, as the cost of litigating a single claim would swamp the expected return for any one plaintiff. A class action is the only procedure for ensuring the fair and efficient litigation of these claims.

In similar cases involving consumer protection claims, courts in this Circuit and District have not hesitated to certify national classes against Delaware companies for conduct emanating from Delaware. *See, e.g., Warfarin*, 391 F.3d at 529 (affirming application of DCFA to nationwide class); *Johnson v. GEICO Cas. Co.*, 673 F. Supp. 2d 255, 276 (D. Del. 2009) (applying DCFA to nationwide class); *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527, 562-563 (D. Del. 1994) (applying Delaware fraud and misrepresentation law nationwide).

For these reasons, and as detailed below, Plaintiffs respectfully request that the Court grant their motion for class certification pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and/or any subclasses the Court deems necessary.

## II.   NATURE AND STAGE OF THE PROCEEDINGS

Section I of Plaintiffs' Motion For An Order Determining ING's Produced Documents Are Not Privileged (filed concurrently under seal), sets forth the nature and state of proceedings.

## III.   SUMMARY OF ARGUMENT

Plaintiffs meet the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), and all requirements of Rules 23(b)(2), (b)(3), and/or (c)(4).

## IV.   STATEMENT OF FACTS[1]

### A.   ING's Uniform Orange and Easy Orange Loans.

From October 1, 2005 through the present, ING has offered its Orange home mortgage loan, an adjustable rate mortgage ("ARM") that provides for a three, five, or seven-year period of fixed-rate interest before requiring a yearly interest-rate adjustment.[2]   From July through the

---

[1] All evidentiary citations are to the Declaration of Daniel M. Hutchinson ("Hutchinson Decl."), and are identified as follows for ease of reference:  (1) "Dep." are deposition transcripts, identified by the deponent's last name, and (2) "Ex." are documents produced in this litigation.
[2] Kendall Dep., 55:1-10; Lugar Dep., 56:9-12.

present, ING has offered its Easy Orange home mortgage loan that provides for a five or ten-year period of fixed interest before requiring either a balloon payment or another mortgage.[3]

**B.    ING's Rate Renew Feature.**

ING's Rate Renew is similar to a standard note modification program offered by many banks. It resets an ARM or balloon mortgage prior to the end of the pre-rate adjustment period (for ARMs) or the balloon payment due date (for balloon mortgages). ING's Rate Renew program differs from standard note modifications in two significant ways: (1) ING branded and advertised the program heavily to its current and prospective mortgage loan holders, and (2) ING's Rate Renew provided for a one-time, low fixed fee rather than the variable—and more expensive—refinance fee charged by most banks.

Rate renewals are a major part of ING's customer retention strategy.[4] Such retention allows ING to cross-sell mortgage holders with other ING products.[5] All Orange Mortgages contain the Rate Renew feature.[6] The Rate Renew feature is embedded within the Easy Orange Mortgage.[7] Thus, with regard to the Rate Renew feature, the loans are the same. Indeed, ING expressly permits customers to move from an Orange Loan to an Easy Orange Loan.[8]

**C.    ING's Uniform Rate Renew Advertising.**

ING has conducted a highly centralized and uniform advertising campaign for its Rate Renew program from its corporate headquarters in Wilmington, Delaware.[9] ING has communicated with both customers and potential customers through its website, direct mail,

---

[3] Kendall Dep., 55:11-17.
[4] Lugar Dep., 54:14-55:9 & Ex. A.
[5] *See* Kendall Dep., 22:12-22, 185:24-186:11.
[6] ███████████████████████████████████████

[7] Kendall Dep., 56:15-23.
[8] *See* Ex. B.
[9] ING's Chief Lending Officer, with ultimate decision-making responsibility for Rate Renew, was based in Wilmington. Lugar Dep., 15:5-16:4, 17:3-5. All other persons responsible for Rate Renew worked in Wilmington. Lugar Dep., 10:12-14 11:6-8; Blackard Dep., 16:5-11, 33:16-20.

postcards, emails, electronic and paper statements, and call center.[10] An ING compliance

specialist reviewed all ING advertisements before they left ING in order to, among other reasons,

identify potential issues with customer confusion.[11] ING has required its head of consumer and

product marketing to ensure that ING's policies are applied consistently.[12] He proudly proclaims

that ING designed its messaging to ensure that *all* of ING's customer communications are

"singing the same song."[13] Accordingly, ING consistently advertised the $500 and $750 Rate

Renew through its website, direct mail, postcards, emails, electronic and paper statements, and

call center.[14] ING can identify which Class members were sent which particular advertisement.[15]

### 1.   Written $500 Rate Renew Guarantees.

From October 2005 to May 2008, ING advertised the $500 Rate Renew through "one-on-

one targeted communication" to Orange mortgage customers (as Easy Orange mortgages did not

yet exist).[16] As a means of customer retention, ING frequently e-mailed current Orange

Mortgage customers to remind them that they could Rate Renew at any time. At least 21,000

Orange mortgage customers received messages with their monthly statements stating:



---

[10] Kendall Dep. 24:15-26:15, 132:5-9.

[11] Blackard Dep., 8:4-6, 17:1-10, 26:16-27:20, 45:19-46:10.

[12] Lugar Dep., 24:3-11.

[13] Lugar Dep., 8:11-15, 9:7-21 ("I was the person in charge at ING Direct working with all the areas, all the product lines, all the different business lines to ensure that there is a unified and kind of consistent tone to product design, to messaging, kind of the outward voice to our consumers and potential consumers. That was my responsibility, make sure they are all, quote, singing the same song."); 76:6-8 (identifying set "policies and procedures"); 76:17-77:7.

[14] Kendall Dep., 45:4-13 ("It would have been advertised in all of those channels.").

[15] Lugar Dep., 98:10-19; Kendall Dep., 181:13-17, 232:20-233:5, 234:18-235:2; Blackard Dep., 29:5-9.

[16] Lugar 94:13-95:9.

[17] Lugar Dep. 119:11-120:17 & Ex. C; *see also* 181:11-182:17 & Ex. D; 183:4-18 & Ex. E; 190:6-21 & Ex. F.

These advertisements did not mention any eligibility requirements.[18] ████████

███████████████████████████████████████

███████████████████████████[19]

### 2.    Written $750 Rate Renew Guarantees.

With the introduction of ING's Easy Orange loan, ING increased its advertising efforts

by promoting the $750 Rate Renew guarantee for its Easy Orange and Orange loans.  From May

2008 through May 2009, quarterly newsletters sent to *all* current ING customers promised:

> Extend your fixed rate period at any time after the first six months for another five
> years by locking in at the current rate for only $750.[20]

Postcards sent regularly to potential new ING mortgage customers likewise reiterated:

> Renew your rate for another five years at the then current Easy Orange rate for
> only $750.[21]

As a means of customer retention, ING frequently e-mailed current Orange and Easy

Orange mortgage customers to remind them that they could Rate Renew at any time—

reinforcing the price points in the original acquisition advertising.  Such emails promised:

> Relax, you may not need a new loan; just have us update your existing Orange
> Mortgage!  It's simple and inexpensive.  For just $750, you can lock in at our
> current rate - as low as [amount] % - for another 5 years without extending the
> time to pay off your mortgage.

> All you need to do is call and accept the offer.  It's that easy.[22]

---

[18] Lugar Dep., 119:24-120:5, 182:12-14, 185:6-13, 190:18-21; Blackard Dep., 36:16-24, 41:21-42:8 (testifying as the compliance officer responsible for reviewing all ads before they left ING that he was not aware of any such language before 2011).

[19] ████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

[20] Lugar Dep., 162:20-163:14 & Ex. H at 2.
[21] Lugar Dep., 179:6-180:9 & Ex. I at 2.
[22] Ex. J.

In direct-mail pieces during the same time period, ING encouraged customers to:

> [G]ive us a call at 1-800-ING-9263 to discuss our rate renewal feature. It's our
> quick and easy way to renew your Orange Mortgage. For only $750, you'll get
> our current low rate as low as [amount] % for the next five years without the
> hassle of appraisals, loan documents, or income verification. We'll send you the
> form, just sign it and mail it back with a check for $750. That's all it takes, just
> accept this offer by [date].[23]

ING has admitted that these and similar advertisements were offers that could be accepted, and

that ING never revoked these offers—even those with no expiration date.[24]

ING's standard operating procedure required ING's call center employees to respond to

Rate Renew inquiries by assuring customers that ING's Rate Renew offers were valid. All ING

call center employees received standardized training so that "the procedures" and "sales points

that they were going to use with customers were *exactly the same*."[25] ING sent "flash training"

to all employees to ensure consistency and compliance.[26] Such procedures ensured that ING's

call center employees were "singing the same song" as ING's written advertisements.

### D.    ING's Knowledge and Intent that Customers Would Rely on Its Rate Renew Advertising.

ING has consistently differentiated itself from competitors by stating that it does not hit

customers with hidden fees or use fine print to limit its products.[27] ING advertisements noted

that ING was a simple company and that customers comparative shopping for mortgages should

---

[23] Ex. K. While a limited number of "test" advertisements contained expiration dates, ING merely included that information to prompt customers to respond more quickly, not to limit the time period that the Rate Renew was available. Kendall Dep., 121:1-10.

[24] Kendall Dep., 116:24–119:4.

[25] Kendall Dep., 51:13-15, 137:16-18, 141:1-5 (emphasis added).

[26] Kendall Dep., 146:10-16 (Flash Training "sent to all of the sales associates who take mortgage calls"); Lugar Dep., 67:13-15 (Q. The sales associates are expected to comply with a training flash like this, correct? A. Yes."); Kendall Dep., 219:14-220:1 (stating that ING further ensures consistency by monitoring phone calls).

[27] Lugar Dep., 43:7-45:19, 97:1-3 ("So our goal is to make sure there is nothing hidden, charges, wording, fees, those kinds of things.").

"[r]ead the fine print, and pay attention to asterisks (you'll notice we don't use any)."[28]  ING

therefore intended that customers would rely upon the truth of its Rate Renew advertisements.[29]

ING knew that its Rate Renew advertisements were material to customers deciding to

purchase or retain an ING mortgage.  In particular, ING was aware of both the short-term nature

of its loans and the common characteristics of ING customers that made Rate Renew an

important feature.[30]  Yet, ING advertisements uniformly *never* "told its customers or prospective

customers that the fee for a Rate Renewal would change or might change."[31]

ING was aware that the Rate Renew feature was valuable for consumers.[32]  For

borrowers like Plaintiffs, the $500 or $750 advertised Rate Renew price was a key selling point

because it gave them security in knowing that, although their ING mortgage would adjust

annually or be due in a lump sum payment after a set period, they could take advantage of the

Rate Renew feature advertised to them and "lock in" their loans for another set time period for a

low, fixed cost.  Comparatively, refinancing most mortgages is expensive and potentially cost

prohibitive.  Such a guarantee is particularly important to persons with the ARM and balloon

loans involved here because, absent the ability to refinance, they would face difficulties paying

the mortgage once the balloon payment became due or the interest rate adjusts upwards. ▮▮▮▮

---

[28] *See, e.g.*, Ex. H at 2; Lugar Dep., 169:13-24 ("I see no asterisks on this page." "I don't see fine print."); 180:6-9.
[29] Kendall Dep., 45:14-21 ("Q.  And of course ING intends for its customers to trust what the ads say, right?  A.  Yes.").
[30] *See, e.g.*, Lugar Dep., 59:4-16 ("An adjustable rate mortgage customer, regardless of whether they are with ING Direct or with another lender, is watching the rate environment more closely for the opportunities to decrease their monthly payments or decrease their rates.  So the product itself and the characteristics of the people who have the type of products is someone who is financially and mortgage rate aware.  So, therefore, they are at a greater, quote, unquote, let's call it risk of leaving any lender."); 88:6-8 ("[T]he types of customers we have are very aware of their finances and looking towards rates moving or looking at rates moving"); 51:21-52:2 ("Easy Orange . . . Rate Renew could offer a consumer at a point in time during which their mortgage an option to change their rate dependent on which way the rate environment was going").
[31] Kendall Dep., 106:15-23.
[32] Lugar Dep., 52:3-9.

[REDACTED],33 [REDACTED]

no one at ING expressed any concern about ING ads causing customer confusion prior to 2011.[34]

### E.    ING's Decision Not To Honor Its Rate Renew Guarantee.

ING decided not to honor its Rate Renew guarantee. Specifically, ING—without its

consumers' knowledge, consent, prior (or even after-the-fact) notice—changed two key Rate

Renew aspects to the detriment of its customers: (1) it greatly increased the fee to Rate Renew,

and (2) it added qualification "requirements" to take advantage of Rate Renew.

### 1.    Pricing.

ING's change in pricing amounts to a classic bait and switch: notwithstanding its

promises, ING steadily increased the price of Rate Renew—from $500, to $750, to the

equivalent of one-month's or two bi-weekly mortgage payments.[35]  Both times that ING

increased the Rate Renew price, interest rates were declining and more ING customers were

taking advantage of the Rate Renew guarantee.[36]

[REDACTED],37 [REDACTED]

---

[33] [REDACTED]

[34] Blackard Dep., 45:23-46:10.

[35] This fee was subject to various caps during certain time periods. From May 1, 2009 through May 30, 2009 the Rate Renew fee was subject to a $2,500 cap. From June 1, 2009 through September 30, 2009, the Rate Renew fee was not subject to any cap. From October 1, 2009 through April 30, 2010, the Rate Renew fee was again capped at $2,500. And from May 1, 2010 through the present, the Rate Renew fee has been subject to a $5,000 cap. As discussed above, ING can identify which customers received which advertisements during which periods. Lugar Dep., 98:10-19; Kendall Dep., 181:13-17, 232:20-233:5, 234:18-235:2; Blackard Dep., 29:5-9.

[36] Kendall Dep., 208:19-209:2 (noting that Rate Renew requests constituted 34% of ING's call center employees' work and 80% of their time). ING was "swamped with [Rate Renew] requests" that prevented ING from making new sales calls. Lugar Dep., 128:2-3, 136:19-21.

[37] [REDACTED]



[38]

[39] ING told

its customers that it was different from "many banks" that use "sneaky fees" and "charges" to

recoup lost income during the economic crisis.[40]

ING concealed the material fact that ING would no longer honor the advertised terms of

Rate Renew. While it was possible to identify each ING customer who received advertisements

with a $500 or $750 Rate Renew, ING did not identify those persons or inform them about the

fee change.[41] Instead, ING actively advertised the Rate Renew through May 2009 and only

disclosed its decision not to honor the Rate Renew guarantee to those customers who

affirmatively inquired about it.

### 2.   Qualification "Requirements"

ING's bait and switch also extended to its imposition of Rate Renew internal ING

eligibility "requirements," not listed in ING advertisements that promised that the company

"do[es]n't use any" "fine print" or "asterisks." Whether these guidelines prevent ING from

offering a Rate Renew guarantee presents common questions.[42]  ING currently follows the same

standard policy in deciding whether to make exceptions to the guidelines.[43]

---

[38] Ex. N at ING 595

[39]

[40] Ex. H.

[41] Lugar Dep., 98:10-99:9 ("I do not recall why we made the decision not to renotify").

[42] At trial, Plaintiffs will submit evidence that: (1) at least 60-80% of ING customers meet (or, at the relevant time, met) ING's eligibility guidelines, Kendall Dep., 111:18-112:23, (2) ING's

*Footnote continued on next page*

### F.    Customers' Uniform Complaints that ING Refuses to Honor Its Rate Renew Guarantee.

█████████████████████████████████████████████████████.[44]

ING's Rule 30(b)(6) deponent on the Rate Renew program stated that "[t]he fact that people were concerned about the fee change was, I mean certainly a concern, but we did not really see the volume of rate renewals slow down."[45] In other words, ING realized that it could charge more than promised without suffering a downturn in customers.

ING's head of customer and product marketing,[46] with responsibility for resolving problems that customers have with their loans,[47] agrees that the "right thing to do" would have been to honor the promises that ING made to its customers.[48] But "being proactive and the fact of going proactive would be giving up in costs millions of dollars, we didn't feel it was warranted."[49] While ING knew that Class members viewed the Rate Renew guarantee as highly material to their decision to purchase or retain ING home mortgages—and was in a position to

---

*Footnote continued from previous page*
guidelines need not be enforced in every instance and that exceptions can be made, Lugar Dep., 36:24-37:3, 37:14-16, and (3) ING made exceptions on 50% of the escalated Rate Renew complaints received between June 1, 2009 and May 31, 2011. Kendall Dep., 245:2-246:19.
[43] Kendall Dep., 246:20-247:16.



[44] ██████████████████████████████████████████████████████

[45] Kendall Dep., 206:17-19.
[46] Lugar Dep., 8:11-15.
[47] Lugar Dep., 19:3-6, 19:20-24, 20:6-16, 21:3-13.
[48] Lugar Dep., 42:13-16 ("doing the right thing means honoring the promises that ING has made to its customers"); 34:8-17 ("Appropriate response" was to provide a Rate Renew to "anyone that called us to ask if they could execute a Rate Renew at a certain price."); 66:7-12 ("Q. And you thought that it was important that if someone saw the Rate Renew advertised at $500 that ING should honor that? A. Yes."); *Id.* at 149:5-19 (Q. You still think it's the right thing to do? A. I do."); 151:12-22 (right thing to do is to honor $750 price point); 100:5-21 (should give benefit of $500 price point to those calling during the $750 price period); 108:5-13 (should give benefit of $750 price point to those calling during the $2,500 price period); 122:6-24 (right thing to do was to honor a promotion).
[49] Battaglia Dep., 42:9-43:18.

inform them of highly material changes to the Rate Renew program—ING never disclosed that it will no longer honor the Rate Renew guarantee. ING clearly knew it had a systemic, classwide problem, but did nothing to address it.[50]

## V.    LEGAL STANDARD

Class certification is proper if Plaintiffs satisfy the requirements of Rule 23(a) and one of the prongs of Rule 23(b). Rule 23 is "designed to assure that courts will identify the common interests of Class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests." *Sullivan*, __ F.3d __, at *34. The class action vehicle allows large numbers of low-value claims involving the same core issues to proceed in the aggregate, providing a path to relief where otherwise there is none. "Class actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981); *see generally* Charles A. Wright, *et al.*, 7A *Fed. Practice & Proc.* § 1751 (3d ed. 2010). Accordingly, "any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 781-82 (3d Cir. 2009) (quoting *Eisenberg*); *In re Wellbutrin SR Direct Purchaser Litig.*, 2008 U.S. Dist. LEXIS 36719 (E.D. Pa. May 2, 2008) (same).

Consumer protection cases like this one, which arise from a single course of conduct that affects large numbers of consumers who purchase a product or service, are particularly amenable to class treatment. *Amchem*, 521 U.S. at 625; *Sullivan*, __ F.3d __, at *45-46, 51-52; *Warfarin*, 391 F.3d at 528; Advisory Comm.'s Notes on Fed. R. Civ. P. 23, 28 U.S.C. App., p. 697.[51]

---

[50] Plaintiffs have refrained from citing additional evidence produced by ING that further supports class certification because of ING's unfounded assertions of privilege. *See* Plaintiffs' Motion For An Order Determining ING's Produced Documents Are Not Privileged (filed concurrently).
[51] Consumer fraud cases are often negative-value cases; that is, the cost to litigate an individual case exceeds the expected return for an individual plaintiff. When these cases proceed as a class, economies of scale allow the aggregated cases to go forward in an efficient manner and litigation
*Footnote continued on next page*

## VI.    THE PROPOSED CLASS SATISFIES RULE 23.

### A.    Plaintiffs Satisfy The Four Requirements Of Rule 23(a).

Rule 23(a) sets forth four "threshold requirements" for all class actions. *Sullivan*, __ F.3d
__, at *39. At class certification, Plaintiffs must "demonstrate that [those elements are] capable
of proof at trial through evidence that is common to the class rather than individual to its
members."[52] *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008). The four
prerequisites—numerosity, commonality, typicality and adequacy—are satisfied here.[53]

### 1.    The Class Is Sufficiently Numerous.

Rule 23(a)(1) requires that the proposed Class be "so numerous that joinder of all
members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs are not required to state the size
of the class with precision. *Cannon v. Cherry Hill Toyota*, 184 F.R.D. 540, 543 (D.N.J. 1999).
The Court may "make common sense assumptions to support a finding of numerosity." *In re
NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996). More than
forty members typically suffices. *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).
ING originated 111,616 first mortgages between October 2005 and January 21, 2011.[54]
Plaintiffs estimate that 77,060 ING customers purchased a home mortgage during the time period
between October 2005 and May 2009 that ING offered a Rate Renew. Numerosity is satisfied.

---

*Footnote continued from previous page*
costs no longer exceed the expected return.  Class actions are often the only means of access to
the legal system when the defendant's conduct causes injury to many consumers, but on a small
scale. *Amchem*, 521 U.S. at 617.
[52] Plaintiffs' Trial Structure, setting forth the common elements of their claims to be tried and the
common evidence that will support/contest them, is attached as Exhibit B to the Selbin Decl.
[53] Plaintiffs' objective and clear definition, set forth in Plaintiffs' Motion for Class Certification,
satisfies the requirement that a class be ascertainable through reference to objective criteria. *See
Rowe v. Dupont*, 262 F.R.D. 451, 455 (D.N.J. 2009).  No subjective determinations are part of
this determination. *Cf. Kline v. Sec. Guards, Inc.*, 196 F.R.D. 261, 267 (E.D. Pa. 2000).
[54] Ex. Q at Response to Interrogatory No. 3.

## 2.    There Are Common Questions Of Fact and Law

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."

Commonality is satisfied where common questions are capable of generating common answers

apt to drive the resolution of the litigation. *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2551

(2011); *Sullivan*, __ F.3d __, at *49 (citing *Dukes*). The commonality requirement "is not a high

bar" and is satisfied "if the named plaintiffs share at least one question of law or fact with the

grievances of the prospective class." *Chiang v. Veneman*, 385 F.3d 256, 265 (3d Cir. 2004);

*Dukes,* 131 S. Ct. at 2556 ("even a single common question will do"). "Commonality does not

require an identity of claims or facts among class members." *In re Honeywell Int'l Inc. Sec.*

*Litig.*, 211 F.R.D. 255, 260 (D.N.J. 2002). "Because the requirement may be satisfied by a single

common issue, it is easily met." *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46,

70 (D.N.J. 2009) ("*Tele Aid*").[55]  Shared questions of law and fact between Plaintiffs and Class

members include:

- Whether ING promised Plaintiffs and Class members a Rate Renew, and the terms of that Rate Renew;
- Whether ING broke that promise to Plaintiffs and Class members;
- Whether ING's Rate Renew and refusal to permit Plaintiffs and Class members to reset their Orange and Easy Orange Loans for a flat fee of $500 or $750 constitute deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of a material fact;
- Whether ING advertised the Orange and Easy Orange Loans with the intent that others rely on its Rate Renew, knowledge that its representation that the loans came with a Rate Renew was false, intent to defraud, reckless indifference to the truth, and/or intent not to sell them as advertised or represented;
- Whether ING's representations about the Orange and Easy Orange Loans were material;

---

[55] *Rule 23(f) appeal denied by Tele Aid*, 2009 U.S. App. LEXIS 12478 (3d Cir. June 4, 2009), *decertification denied by* 267 F.R.D. 113  (D.N.J. 2010); *28 U.S.C. § 1292(b) Petition denied by* 2010 U.S. App. LEXIS 8087 (3d Cir. Apr. 19, 2010), *reconsideration denied by* 2010 U.S. Dist. LEXIS 75911 (D.N.J. July 22, 2010).

- For certain claims, whether Plaintiffs' and Class members' reliance on those representations, as evidenced by their purchase and/or retention of Orange and Easy Orange Loans with the Rate Renew, was justifiable;

- Whether Plaintiffs and the Class are entitled to damages and/or declaratory relief;

- Whether ING was unjustly enriched at the expense of Plaintiffs and Class members.

These questions—and the answers they will generate—are common to the Class, and satisfy Rule 23(a)(2).[56]

### 3.  **Plaintiffs' Claims Are Typical Of The Class' Claims**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).[57]  Claims are typical if they "arise from the same alleged wrongful conduct" and are based on "the same general legal theories." *Warfarin*, 391 F.3d at 532; *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994). Accordingly, "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class members usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998); *see also Eisenberg*, 766 F.2d at 786 (holding that Rule 23(a)(3) does not require that the claims of the representative and other Class members be identical); *Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988) (same); *Tele Aid*, 257 F.R.D. at 46.  Typicality is satisfied where Plaintiffs and the Class "point to the same broad course of alleged fraudulent conduct to support a claim for relief." *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 640 (D.N.J. 2004); *Stewart*, 275 F.3d at 227.

---

[56] "The commonality requirement is subsumed by the predominance requirement." *Sullivan*, __ F.3d __, at *42. Accordingly, Plaintiffs predominance showing, discussed *infra*, also satisfies commonality.

[57] Typicality is intended to ensure that the interests of the named plaintiffs are aligned with the interests of the absent members. *Stewart*, 275 F.3d at 227. When typicality is met, "the named plaintiff, in seeking to maximize her or his own recovery, will also maximize the recovery by the class." *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180,185 (D.N.J. 2003).

Here, Plaintiffs' claims are typical of the claims of all Class members because they arise from precisely the same course of conduct. They, like all Class members, purchased or retained ING home mortgages during the period that ING advertised its Rate Renew guarantee; ING refused to permit Plaintiffs to reset their ING home mortgages for the amounts promised. There are no conflicts between the named Plaintiffs and Class members.

### 4.    Plaintiffs Will Adequately Represent The Class

Rule 23(a)(4) tests whether the proposed class representatives' interests conflict with the interests of the class. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir. 2001).[58]  Adequacy ensures "the representative plaintiffs will fairly and adequately protect the interests of the class" and is intended "to uncover conflicts of interest between named parties and the class they seek to represent." *Warfarin*, 391 F.3d at 532. To be cognizable, a conflict between the proposed class representatives and absent Class members must be "real," not hypothetical or speculative. *In re Tyson Foods, Inc. Secs. Litig.*, 2003 WL 22316548 (D. Del. Oct. 6, 2003). "Indeed, courts are generally skeptical of defenses to class certification based on conflicts between the proposed Class members. . . . Such arguments are unavailing except in the rarest of cases where a conflict is so palpable as to outweigh the substantial interest of every Class member in proceeding with the litigation." *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, 2006 WL 891362, at *8 (D.N.J. Apr. 4, 2006).

There are no such conflicts here. The named plaintiffs share the same incentives as absent Class members—to prove that ING failed as a matter of policy and practice to honor the terms of its Rate Renew guarantee. Plaintiffs have made considerable effort on behalf of themselves and the entire Class, including consulting with attorneys, sitting for deposition,

---

[58] Pursuant to the 2003 amendments to Rule 23, the qualifications of the Plaintiffs' counsel are assessed pursuant to subsection (g), and therefore are addressed below.

responding to interrogatories, gathering documents, and reviewing the Amended Complaint.[59]
Plaintiffs have expressed their commitment to the case, and have pledged to remain active
participants and representatives on behalf of the entire class.[60]

**B.    Certification Is Proper Under Both Rule 23(b)(2) and Rule 23(b)(3)**

As set out below, Plaintiffs seek certification under Rule 23(b)(2) and/or 23(b)(3).

**1.    Certification Under Rule 23(b)(2) Is Appropriate.**

Plaintiffs seeks certification under Rule 23(b)(2), which requires a showing that "the
party opposing the class has acted or refused to act on grounds that apply generally to the class,
so that final injunctive relief or corresponding declaratory relief is appropriate respecting the
class as a whole." Fed. R. Civ. P. 23(b)(2); *Sullivan*, __ F.3d __, at \*39.  Unlike Rule 23(b)(3), a
plaintiff does not need to show predominance of common issues or superiority of class
adjudication under this subsection, but only a showing of cohesiveness of the class claims. *See
Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998).  "What is important is that the
relief sought by the named plaintiffs should benefit the entire class." *Baby Neal*, 43 F.3d at 59.

Here, Plaintiffs seek certification under Rule 23(b)(2) because ING "has acted or refused
to act on grounds that apply generally to the class" by refusing to honor its Rate Renew
guarantee, so that final injunctive relief or corresponding declaratory relief providing Plaintiffs
and Class members the ability to take advantage of Rate Renew for the promised fee of $500 or
$750 without regard to ING's undisclosed qualification guidelines "is appropriate respecting the
class as a whole." Fed. R. Civ. P. 23(b)(2).  Plaintiffs seek a straightforward injunction to
protect consumers prospectively:  ING must "do the right thing" and honor the promised $500 or
$750 Rate Renew to its customers, without further qualification.  Such an injunction would be of

---

[59] *See* J. Yarger Decl., ¶ 5; T. Yarger Decl., ¶ 5.
[60] *Id.*

overwhelming positive value and would further the DCFA's drafters' clear legislative intent "to protect consumers . . . from unfair or deceptive merchandising practices" and ensure "that such practices be swiftly stopped and that this subchapter shall be liberally construed and applied to promote its underlying purposes and policies." Del. Code Ann. tit. 6, § 2512.

Even if the Court were to find that the entirety of the claims are not amenable to Rule 23(b)(2) certification, the Court has the discretion to take a "hybrid approach," certifying the case under both subsections of Rule 23(b), or to certify the equitable portion of the case under Rule 23(b)(2) and the damages portion of the case under Rule 23(b)(3). *See M.A. Ex rel. E.S. v. Newark Pub. Sch.*, 2009 WL 4799291, at *16 (D.N.J. Dec. 7, 2009); *see also, e.g., Wilson v. County of Gloucester*, 256 F.R.D. 479, 491 (D.N.J. 2009) (calling certification of case under both subsections "best of both worlds"). In addition, the Third Circuit has emphasized that district courts have ample discretion under Rule 23(c)(4) to certify particular claims or issues in a case, or in other words, "to treat common things in common and to distinguish the distinguishable." *Chiang*, 385 F.3d at 267.

### 2. Certification Under Rule 23(b)(3) Is Appropriate.

Rule 23(b)(3) provides for certification of a class where "questions of law or fact common to members of the class predominate over any questions affecting only individual members" and class treatment "is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Both requirements are satisfied here.

#### a. Common Questions of Law and Fact Predominate.

The predominance inquiry "is informed by the defendant's conduct." *Sullivan*, __ F.3d __, at *37; *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 187 (D.N.J. 2003) ("Common issues predominate when the focus is on the defendant's conduct and not on the conduct of the individual Class members."). "[T]he focus is on whether the defendant's conduct was common

as to all Class members, not on whether each plaintiff has a 'colorable claim.'" *Sullivan*, __ F.3d __, at *42 (citing *Dukes*, 131 S. Ct. 2541).[61] It follows that "predominance is a test readily met in certain cases alleging consumer[ ] fraud." *Amchem*, 521 U.S. at 625; *Sullivan*, __ F.3d __, at *39 (quoting *Amchem*). The predominance requirement ensures that the class is "sufficiently cohesive to warrant adjudication by representation" and will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Sullivan*, __ F.3d __, at *37 (quoting *Amchem*, 521 U.S. at 623); *In re Ins. Broker Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009).

Predominance focuses on the substantive law on which plaintiffs base their claims. *Tele Aid*, 257 F.R.D. at 72-73. For this analysis, the Court determines whether evidence common to the class can be used to prove the elements of each of Plaintiffs' claims. *See In re Hydrogen Peroxide*, 552 F.3d at 311 (stating that courts are to "examine the elements of plaintiffs' claim through the prism of Rule 23" in analyzing predominance); *Sullivan*, __ F.3d __, at *68 ("A court may inquire whether the elements of asserted claims are capable of proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims."); *Tele Aid*, 257 F.R.D. at 73. However, "plaintiffs need not actually establish the validity of claims at the certification stage." *Sullivan*, __ F.3d __, at *69. Common questions of law and fact predominate where, as here, ING's conduct will be the focus of each claim.

This is plainly one of those "certain cases," where the bulk of the issues to be resolved pertain to ING's conduct and knowledge. Resolution of those core issues will turn on the same

---

[61] Predominance "does not require that all Class members share identical claims." *Sullivan*, __ F.3d __, at *53-54. "Predominance exists where the efficiencies gained by class resolution outweigh the individual issues." *Varacallo*, 226 F.R.D. 207, 231 (D.N.J. 2005). Even a small number of common issues can satisfy predominance if the resolution of those issues will "significantly advance the litigation." *In re Mercedes-Benz*, 213 F.R.D. at 186

documentary evidence and testimony from key ING decision-makers. Indeed, it is difficult to imagine how such evidence possibly could vary from Class member to Class member. Courts in this Circuit readily certify such cases. *See, e.g., Warfarin*, 391 F.3d at 522, 528 (certifying DCFA class where alleged dissemination of misleading information was "conducted by and directed from corporate headquarters" as the common proof of liability depended upon the defendant's misleading conduct, not the conduct of individual Class members). These claims are particularly well-suited to class treatment here because the case is entirely about a single uniform course of conduct directed by ING at consumers that affected each in the same way. Where plaintiffs allege uniform treatment by defendants, and suffer uniform impact, the benefits of class treatment are apparent. These are the cases "the Advisory Committee sought to cover[,] in which a class action would achieve economies of time, effort, and expenses, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem.*, 521 U.S. at 615.

### i.    **Delaware Law Applies.**

Delaware law applies to the claims of all Class members here for at least two reasons. First, ING uniformly and unilaterally imposed a choice-of-law clause on Plaintiffs and all Class members that governs the representations and omissions that form the bases of Plaintiffs' claims. That provision states, in relevant part, that the relationship between Plaintiffs and all Class members and ING in which such representations and omissions arose must be "governed by and construed in accordance with the laws of the State of Delaware."[62]  ING's standard Easy Orange Note Modification Agreement further states that it shall be governed "by the substantive laws of the State of Delaware without reference to principles of conflict of laws."[63]

---

[62] Ex. R at 2.
[63] Ex. S at ING 204.

ING has even asserted in prior litigation that virtually identical clauses require application of Delaware law. In its Amended Responses to Plaintiffs' Second Set of Requests for Admission, ING admitted that it "sought to enforce [a] Delaware choice-of-law provision in [a] service contract" in prior litigation.[64] In the prior case, ING argued that "the laws of the State of Delaware would control . . . [because of] a choice of law clause contained in the original Service Agreement."[65] The wording of that service agreement is nearly identical to the standard Easy Orange Note Modification Agreement, discussed above. The service agreements' choice-of-law provision read, in part, that the "[a]greement shall be governed by the laws of the State of Delaware without reference to its principles of conflict of laws."[66]

Second, Delaware law applies to the DCFA claim asserted in this action because ING's unlawful practices occurred in, or emanated and was orchestrated from, Delaware. *Warfarin*, 212 F.R.D. 231, 248 (D. Del. 2002) (discussing the DCFA's "within this State" provision); *Lony v. E.I. du Pont de Nemours & Co., Inc.*, 821 F. Supp. 956, 961 (D. Del. 1993) (same). Courts in this Circuit readily apply state law to such conduct. *Warfarin*, 391 F.3d at 522, 528 (alleged dissemination of misleading information was "conducted by and directed from corporate headquarters" as the common proof of liability depended upon the defendant's misleading conduct, not the conduct of individual Class members); *Johnson*, 673 F. Supp. 2d at 276 (applying DCFA to nationwide class); *see also In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. at 562-563 (applying Delaware common law fraud and negligent misrepresentation law to nationwide class); *Tele Aid*, 257 F.R.D. at 59 (applying New Jersey law to decisions "made and

---

[64] Ex. T at Answer 24.

[65] Ex. U at 5-6 (ING's Opposition Brief in *ING v. Team One Appraisals & Am. Reporting Co., LLC*, No. 09-cv-00897 (D. Del.), D.I. 14, at ¶¶ 19-20).

[66] Ex. V at 6 (Services Agreement attached to ING's Opposition Brief in *ING v. Team One Appraisals & Am. Reporting Co., LLC*, No. 09-cv-00897 (D. Del.), D.I. 14-2, at ¶ 10.3).

implemented" company in New Jersey).[67] Delaware law applies to all claims asserted here because Delaware has the most significant relationship to them.[68] *See, e.g., In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. at 563.[69]

## ii.  DCFA Claim.

Consumer claims, by their nature, involve large numbers of plaintiffs, a single or small number of defendants, and a common course of conduct that affected each plaintiff in the same way. The DCFA purposefully covers cases that share those qualities—large numbers of small claims. Because the Act's purpose is to "protect consumers," the Act is "liberally construed and applied to promote its underlying purposes and policies." 6 Del. C. § 2512; *Young v. Joyce*, 351 A.2d 857, 859 (Del. 1975). To prove a claim under the DCFA, each plaintiff must show: (a) that ING Rate Renew advertisements made a false representation and/or omitted a material fact, (b) that ING intended for Plaintiffs to rely on the representation or omission, and (c) damages.[70] The Act does not require that a defendant intend to deceive the consumer. *Nash v. Hoopes*, 332 A.2d 411, 413 (Del. Super. 1975) ("Fraudulent intent in connection with the making of an unlawful practice is not requisite to the availability of the remedies of the [statute]."); *In re Brandywine Volkswagen, Ltd.*, 306 A.2d 24 (Del. Super. 1973), *aff'd* 312 A.2d 632 (Del. 1973).

---

[67] *Elias v. Ungar's Food Prods.*, 252 F.R.D. 233 (D.N.J. 2008)  (applying the New Jersey law to nationwide class of purchasers of health food products); *Dal Ponte v. American Mortgage Express Corp.*, 2006 WL 2403982, *8 (D.N.J. Aug. 17, 2006) (applying New Jersey law to nationwide class involving mass cancellation of mortgages); *Nafar v. Hollywood Tanning Sys., Inc.*, 2008 WL 3821776 (D.N.J. Aug. 12, 2008) (applying New Jersey law to nationwide class).
[68] It is well-settled that a forum state may apply its own substantive law to the claims of a nationwide class without violating the federal due process clause or full faith and credit clause if the state has a "significant contact or significant aggregation of contacts" to the claims of each Class member such that application of the forum law is "not arbitrary or unfair." *Phillips Petro. Co. v. Shutts*, 472 U.S. 797, 821-22 (1985); *see also Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-313 (1981).
[69] If the Court finds that Delaware law cannot apply to the nationwide class, plaintiffs will request permission to further brief this issue to show that common questions predominate over individual questions under the law of each of state. *See also Sullivan*, __ F.3d __, at *38 ("variations in state law do not necessarily defeat predominance").
[70] 6 Del. C. § 2513.

Rather, it only requires that, in omitting or concealing a material fact, the defendant intended that consumers rely on the omission or concealment. *Id.* The DFCA explicitly covers advertising of mortgage-financing charges. 6 Del. C. § 2511(1); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1073 (Del. 1983); DEL. P.J.I. CIV. § 16.5 (2000). Courts consistently have recognized that reliance is not a required element in establishing a claim under the DCFA.[71] DCFA claims therefore rarely involve individual issues of any weight. Consequently, class treatment of consumer fraud claims in Delaware is frequently held to be appropriate. *See, e.g., Warfarin*, 391 F.3d at 529; *Johnson*, 673 F. Supp. 2d at 276.

ING's $500 and $750 Rate Renew advertisements constitute a "uniform course of conduct" that supports predominance. *Chiang*, 385 F.3d at 266; *Tele Aid*, 257 F.R.D. at 73 (consumer fraud claims based on representation or omissions "turn on the knowledge and actions of the company rather than those of the individual Class members" support predominance); *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 113 (E.D. Pa. 2005) ("predominance is normally satisfied when plaintiffs have alleged a common course of conduct"). Plaintiffs will present evidence of ING's Rate Renew guarantee common to all Class members, including ING advertisements and ING's own internal documents and corporate testimony showing its corporate-level knowledge and intent that Plaintiffs and Class members would rely on and "trust" ING's advertisements. Such common evidence forms the gravamen of each Plaintiff and Class member's claim. *See, e.g.*, *Elias*, 252 F.R.D. at 238-39 (although defendants argued "the

---

[71] *See, e.g.*, *Johnson v. GEICO Cas. Co.*, 673 F. Supp. 2d 255, 276 (D. Del. 2009) (finding that plaintiffs need not prove individual reliance under 6 Del. C. § 2513); *Eames v. Nationwide Mut. Ins. Co.*, 412 F. Supp. 2d 431, 437 (D. Del. 2006) (violation of the DCFA occurs regardless of whether actual reliance is shown); *S&R Assocs., L.P. v. Shell Oil Co.*, 725 A.2d 431, 440 (Del. Super. Ct. 1998) ("While a fraud action at common law requires the plaintiff to prove reliance, there is no corresponding reliance requirement in 6 Del. C. § 2513."); *Ayers v. Quillen*, No. 02-004, 2004 WL 1965866, at *6 (Del. Super. Ct. June 30, 2004) (noting that "the consumer claiming [DCFA] consumer fraud need not prove personal reliance upon the false statement").

representations at issue are varied and diverse, … defendants' conduct subjected each purchaser to the same wrongful course of conduct and thereby produced the same claims, supported by the same evidence and responded to by defendants with the same defenses."). ING directed its conduct at all Class members, prominently advertising the Rate Renew guarantee to its customers. These facts are central to the question of liability, and proof of such facts is clearly common to all Class members. *Varacallo v. Mut. Life Ins. Co.*, 226 F.R.D. 207, 231 (D.N.J. 2005) ("in cases where it is alleged that the defendant made similar misrepresentations, non-disclosures, or engaged in a common course of conduct, courts have found that conduct to satisfy the commonality and predominance requirements"); *Nafar*, 2008 WL 3821776, at *5 (same).

### iii.    Common Law Fraud Claim.

Common questions also predominate as to each element of the common law fraud claim. The elements of a common law fraud claim are: (1) the false representation of (or concealment of) a fact that is important to another; (2) the knowledge or belief that this representation was false, or was made with reckless indifference to the truth; (3) the intent to induce the plaintiff or plaintiffs to act on the false representation, or to decline to act; (4) the fact that plaintiff or plaintiffs acted, or declined to act, in justifiable reliance on the false representation; and (5) damage to plaintiff or plaintiffs as a result of this reliance. *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992); DEL. P.J.I. CIV. § 16.1 (2000).

Plaintiffs will present much of the same common evidence for the common law fraud claim as they will for the DCFA claim—ING advertisements, corporate testimony, and internal documents showing ING's corporate-level knowledge and intent that Plaintiffs and Class members would rely on and "trust" ING's advertisements; and classwide evidence of damages.

For reliance, Delaware courts explicitly hold in consumer fraud cases that "the trier of fact may presume reliance [on a classwide basis]. . . where the defendant fails to disclose

material information." *See, e.g., City of Roseville Employees Ret. Sys. v. Horizon Lines, Inc.*,

713 F. Supp. 2d 378, 392 (D. Del. 2010) (citing *Affiliated Ute Citizens of Utah v. United States*,

406 U.S. 128, 153-54 (1972). Similarly, "where materially misleading statements have been

disseminated" into the marketplace, reliance "may be presumed" on a classwide basis. *Id.* (citing

*Basic Inc. v. Levinson*, 485 U.S. 224 (U.S. 1988)). Relying upon this Supreme Court precedent

that reliance may be presumed through common evidence on a classwide basis, this Court has

found predominance and certified a class of customers receiving misleading statements its

advertisements for credit card accounts. *Spark v. MBNA Corp.*, 178 F.R.D. 431, 435 (D. Del.

1998). In such consumer fraud cases where the advertisements at issue distinguish the financial

product by highlighting material terms that differentiate it from other products, "[g]enerally, the

court may presume reliance in a case 'where it is logical to do so.'" *Id.* (quoting *Sharp v.*

*Coopers & Lybrand*, 649 F.2d 175, 188 (3d Cir. 1981)); *see also Eisenberg*, 766 F.2d at 786 (the

"presence of individual questions as to the reliance of each [plaintiff] does not mean that the

common questions of law and fact do not predominate over questions affecting individual

members as required by Rule 23(b)(3)."); *Easton & Co. v. Mutual Benefit Life Ins. Co.*, 1993 WL

89146 at *5 (D.N.J. Feb. 9, 1992)) (explaining that "it is well-settled in this Circuit that

individual issues as to reliance or damages do not negate predomination under Rule 23(b)(3)").

Plaintiffs can therefore prove reliance through common evidence on a classwide basis.

### iv.    Promissory Estoppel Claim.

Common questions also predominate for the promissory estoppel claim. Under Delaware

law, to establish a claim for promissory estoppel, one need only show: (1) a promise to

plaintiffs, and (2) the plaintiffs' reasonable reliance on that promise to their detriment. *Borish v.*

*Graham*, 655 A.2d 831, 835-36 (Del. Super. Ct. 1994); DEL. P.J.I. CIV. § 19.14 (2000).

Common evidence of ING's conduct and Plaintiffs' and Class members' reliance on the same will establish this claim on a classwide basis.

### v.    Breach of Implied Covenant of Good Faith and Fair Dealing Claims.

Common questions predominate as this claim arises from the same core conduct and is subject to the same common proof. *Spark*, 178 F.R.D. at 435 (certifying class claim for the breach of the implied covenant of good faith and fair dealing based upon allegedly misleading statements in advertisements for credit card accounts).

### vi.    Unjust Enrichment Claim.

Common questions also predominate with respect to the unjust enrichment claim, which arises from the same core conduct by ING, and is subject to much of the same common proof. *See Tele Aid*, 257 F.R.D. at 73 (finding predominance because the elements of unjust enrichment claim "deal only with [defendant's] behavior"); *Dal Ponte*, 2006 WL 2403982 at *8 ("[G]iven the allegation that [Defendant] engaged in an uniform pattern of improper conduct toward all proposed class members, common issues will predominate the proof of [unjust enrichment] claims"); *Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232 (W.D. Pa. 2008) (unjust enrichment claim "is appropriate for class treatment" where defendant "followed the same standard procedures . . . in exactly the same way for each putative Class member").

### vii.    Damages for All Claims.

Each Class member suffered damages, including money paid ING for that Rate Renew that exceeded the promised fee, and increased loan or finance payments when ING refused to honor its Rate Renew guarantee. Such damages can be determined based upon ING's own records on an entirely objective, Class-Member-by-Class-Member basis in the aggregate.[72]

---

[72] *See* Declaration of Stephen J. Scherf, CPA, filed herewith.

Whether damages caused by ING's uniform course of conduct vary among Class members does not bar certification. It is settled law in the Third Circuit that the need for individualized damages inquiry does not necessarily defeat class certification. *See, e.g., Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 249 (W.D. Pa. 2008) (citing *In re Cmty. Bank*, 418 F.3d at 305-06).

    **b.**  **A Class Action Is a Superior Method for the Fair and Efficient Adjudication of This Controversy**

  At the end of the day, class certification is only a procedural determination, albeit an important one. Rule 23(b)(3) requires that the court find "that a class action is superior to other available methods for fairly and effectively adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); Fed. R. Civ. P. 1 ("[Federal Rules] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding"). A class action is the superior—indeed, the only—method of resolving these claims. The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 316; *Warfarin*, 391 F.3d 516 (same). Rule 23(b)(3) lists the following factors to guide the superiority inquiry: (1) the Class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against Class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed R. Civ. P. 23(b)(3). Here, Class treatment is the vastly superior option. The benefits of certifying this Class include access to the courts for Class members defrauded out of several hundreds or thousands of dollars apiece.

  ***The interest of individual Class members in controlling the litigation.*** Unlike in cases

involving personal injuries and high value claims, in which individual class members may have an interest in controlling the litigation, here there are no such interests. Individual prosecution of these claims is impractical—the cost of litigating a single case would likely exceed the potential return. "Indeed, the size of each claimant's alleged loss is undoubtedly too small to be economically litigated at all outside of a class action." *See, e.g., In re Mercedes-Benz*, 213 F.R.D. at 191 ("The high price of Mercedes-Benz automobiles notwithstanding, . . . the relatively small amount at stake for each claimant vitiates any argument that each has an interest in controlling the prosecution of the case"); *Nafar*, 2008 WL 3821776 at *6. As such, this case fulfills what the Supreme Court has recognized as the class device's promise of providing similarly situated plaintiffs with relatively small claims an opportunity to obtain redress. *See, e.g., Amchem*, 521 U.S. at 617; *Shutts*, 472 U.S. at 813 ("The plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually.").

*The extent and nature of litigation already commenced by the class.* Counsel is aware of no other current litigation concerning ING's Rate Renew. This fact reinforces that Class members cannot, as a practical matter, litigate this case individually. *See, e.g., In re Cmty. Bank of N. Va.*, 418 F.3d 277, 309 (3d Cir. 2005) (finding superiority requirement met where small number of pending individual suits "indicat[ed] a lack of interest in individual prosecution").

*The desirability of concentrating the litigation in a given forum.* This factor supports certification. Concentrating the litigation in a single forum will allow the litigation to proceed in an efficient manner without the risk of inconsistent outcomes. Delaware, as home to ING and the locus of its course of conduct, is a desirable forum. *Nafar*, 2008 WL 3821776 at *6 ("New Jersey is a desirable forum for this action because Defendant is a New Jersey Corporation"). Many, if not all, of the key witnesses are located in Delaware; at ING's request, all depositions

of ING personnel responsible for the Rate Renew program have occurred in Wilmington.[73]

***The case is manageable as a class action.*** This case presents no notable manageability issues. This consumer fraud case is relatively straightforward, with a core set of liability issues that pertain to the entire Class that can be tried on overwhelmingly common evidence.[74] Once these common issues are resolved, there will be few (if any) issues remaining for individual resolution. The class is well defined and known by ING, who maintains records of its mortgage customers. *Dal Ponte*, 2006 WL 2403982 at *9 (finding no manageability issues where claims are based on common allegations and identity of Class members available in defendant's records). Even if there could be theoretical difficulties in managing the case on a class basis, a district court "may not ... assume, *arguendo*, that problems will arise, and decline to certify the class on the basis of a mere potentiality that may or may not be realized." *United Steelworkers v. ConocoPhillips Co.*, 593 F.3d at 802, 809-10 (9th Cir. 2010). "The fact that administrative problems may arise is not dispositive of the class-action question; they must be weighed against the benefits in maintaining the action under Rule 23." 7AA *Fed. Practice & Proc.* § 1780.

***Class treatment is far superior to any alternative available method of adjudication.*** Ultimately, "the superiority requirement asks a district court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication.'" *Tele Aid*, 257 F.R.D. at 75 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996)). Class treatment is clearly superior to the only available alternative here—individual adjudication of tens of thousands of claims. Each claim is worth less than the cost of individual litigation. No rational plaintiff would pursue such a claim on an individual basis. Indeed, no one plaintiff has. *See O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266,

---

[73] ING also imposed a choice-of-forum clause on all Class members, necessitating that any claims be brought in Delaware. Exs. R & S.
[74] *See* Plaintiffs' Trial Structure, filed herewith.

293 (E.D. Pa. 2003) ("The class action vehicle in this case will provide significant benefits to Class members. This is in sharp contrast to pursuing their own negative value claims.")

The obvious benefit of class treatment, therefore, is that it is the only means by which these claims will be heard. Yet the cost of class treatment is negligible, because the claims will be established with common proof, including standard marketing materials advertised to the Class. This proof does not vary from plaintiff to plaintiff. Indeed, individual adjudications of liability would only result in a large number of duplicative trials, presenting identical evidence in support of identical claims, increasing overall litigation costs and the risk of inconsistent rulings—counter to both the efficiency and fairness goals of Rule 23.

## VII.   APPOINTMENT OF CLASS COUNSEL

Fed. R. Civ. P. 23(g)(1) provides that "a court that certifies a class must appoint class counsel" and instructs the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class." As the accompanying declarations of counsel set forth, the class is represented by a group of firms with deep experience prosecuting consumer class actions that have committed and will continue to commit more than sufficient resources to prosecuting this case.[75]

## VIII.   CONCLUSION

Plaintiffs respectfully submit that certification of the proposed class satisfies Rule 23. For all of the reasons discussed above, the Court should certify the proposed Class, appoint Plaintiffs as Class representatives, and appoint the counsel below as Class counsel.

---

[75] Selbin Decl., ¶¶ 1-7 & Ex. A; Wilson Decl., ¶¶ 1-11 & Ex. A; Goddess Decl., ¶¶ 1-3.

Dated:  January 10, 2011        ROSENTHAL, MONHAIT & GODDESS, P.A.

By: _____
       Jeffrey S. Goddess

Jeffrey S. Goddess (No. 630)
jgoddess@rmgglaw.com
P. Bradford deLeeuw (No. 3569)
bdeleeuw@rmgglaw.com
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 Market Street, Suite 1401
Wilmington, DE  19899-1070
Telephone:  (302) 656-4433
Facsimile:  (302) 658-7567

Jonathan D. Selbin
jselbin@lchb.com
Daniel R. Leathers
dleathers@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

Daniel M. Hutchinson
dhutchinson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

David P. Meyer
dmeyer@dmlaws.com
Matthew R. Wilson
mwilson@dmlaws.com
MEYER WILSON CO., LPA
1320 Dublin Road, Suite 100
Columbus, OH  43215
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066

*Attorneys for Plaintiffs and the Proposed Class*