IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JOHNATHAN AND TRUDE YARGER,
a married couple,

        Plaintiffs,

    v.

ING BANK, FSB D/B/A/ ING DIRECT,

        Defendant.

Civil Action No.:  1:11-cv-00154-LPS

## DEFENDANT'S BRIEF IN OPPOSITION TO
## MOTION FOR CLASS CERTIFICATION

MONTGOMERY, McCRACKEN, WALKER
&   RHOADS, LLP

R. Montgomery Donaldson (DE I.D. #4367)
Lisa Z. Brown (DE I.D. #4328)
1105 N. Market Street, 15th Floor
Wilmington, DE 19801
(302) 504-7840
rdonaldson@mmwr.com

*Attorneys for Defendant ING Bank, fsb*

Of Counsel:

Frank A. Hirsch, Jr., Esquire
Matthew P. McGuire, Esquire
Heather Adams, Esquire
Ryan P. Ethridge, Esquire
ALSTON & BIRD LLP
4721 Emperor Blvd., Ste. 400
Durham, NC 27703
(919) 862-2200

DATED: February 24, 2012

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................... 1

II. NATURE AND STAGE OF PROCEEDINGS ....................................................... 2

III. SUMMARY OF ARGUMENT ............................................................................... 2

IV. STATEMENT OF FACTS ...................................................................................... 3
    A. ING's Products and Marketing ......................................................................... 3
       1. Orange Mortgage, Easy Orange Mortgage and Rate Renewal ........................ 3
       2. Oral Representations Regarding Rate Renewal ............................................. 5
       3. Written Representations Regarding Rate Renewal .......................................... 5
          a. ING's Website ........................................................................................ 5
          b. *E-mails* ................................................................................................. 6
          c. Direct Mail ............................................................................................ 7
          d. Monthly Statement Messages ................................................................ 7
       4. Loan Documentation and Offers ................................................................... 8
          a. Offer Letters .......................................................................................... 8
          b. EZO Fact Sheet ..................................................................................... 9
          c. Rate Renewal Addenda .......................................................................... 9
    B. The Yargers' Unique Transaction History ......................................................... 9

V. LEGAL STANDARD ........................................................................................... 11

VI. ARGUMENT ....................................................................................................... 12
    A. Plaintiffs Cannot Satisfy Rule 23(a) ............................................................... 12
       1. Numerosity Fails for Lack of an Ascertainable Class ................................... 12
       2. Unique Facts Surrounding Plaintiffs' Loan Transactions Defeat
          Commonality ............................................................................................... 13
       3. The Yargers Are Not Typical of the Proposed Class ..................................... 14
    B. Plaintiffs Cannot Satisfy Either Rule 23(b)(2) or Rule 23(b)(3) ..................... 16
       1. No single injunction will satisfy Rule 23(b)(2) ............................................ 16
       2. Rule 23(b)(3) Certification is Improper for Lack of
          Predominance ............................................................................................. 17
          a. Applicable Conflicts-of-Law Principles Disallow the
            Application of Delaware Law to All Borrowers ........................................ 19
              i. ING's Loan Documents Require Application of
                the Laws Where Each Borrower's Property
                is Located ...................................................................................... 20
              ii. The Home States of the Remaining Class
                Members Have the "Most Significant
                Relationship ................................................................................. 22
          b. Plaintiffs' DCFA Claim Requires Individualized
            Inquiries ................................................................................................. 22

    c. Adjudicating Plaintiffs' Fraud Claim Requires Highly
Individualized Inquiries ............................................................... 25

    d. Plaintiffs' Equitable Claims Necessitate Individualized
Factual Inquiries.......................................................................... 27

    e. Damages Cannot Be Determined on a Class-Wide Basis ................... 28

3. Class Treatment Is Not the Superior Method for Adjudicating
the Dispute ............................................................................................ 30

CONCLUSION............................................................................................................. 30

# TABLE OF AUTHORITIES

CASES                                                                                          PAGE(S)

*Aubrey v. Sanders*,
   346 F. App'x 847 (3d Cir. 2009) ..........................................................................26

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)...........................................................................................26

*Chrysler Corp. v. Chaplake Holdings, Ltd.*,
   822 A.2d 1024 (Del. 2003) ...............................................................................27

*Chudner v. Transunion Interactive, Inc.*,
   2010 WL 5662966 (D. Del. Dec. 15, 2010)...............................................29, 30

*Crowhorn v. Nationwide Mut. Ins. Co.*,
   2002 WL 1767529 (Del. Super. Ct. July 10, 2002) ..........................................25

*Dal Ponte v. Am. Mortg. Express Corp.*,
   2006 WL 2403982 (D.N.J. Aug. 17, 2006) .......................................................28

*Donaldson v. Microsoft Corp.*,
   205 F.R.D. 558 (W.D. Wash. 2001) .................................................................14

*Doninger v. Pac. Nw. Bell, Inc.*,
   564 F.2d 1304 (9th Cir. 1977) ..........................................................................12

*Easton & Co. v. Mutual Benefit Life Ins. Co.*,
   1993 WL 89146 (D.N.J. Feb. 9, 1993) .............................................................27

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985)..............................................................................27

*Gaffin v. Teledyne, Inc.*,
   611 A.2d 467 (Del. 1992) ............................................................................25, 26

*Gartin v. S & M NuTec LLC*,
   245 F.R.D. 429 (C.D. Cal. 2007).......................................................................30

*Gates v. Rohm and Haas Co.*,
   655 F.3d 255 (3d Cir. 2011)..............................................................................29

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)...........................................................................................12

*Georgine v. Amchem Prod., Inc.*,
   83 F.3d 610 (3d Cir. 1996..................................................................................21

*Grovatt v. St. Jude Med., Inc. (In re St. Jude Med., Inc.),*
    522 F.3d 836 (8th Cir. 2008) ..................................................25

*Heisler v. Maxtor Corp.,*
    2010 WL 4788207 (N.D. Cal. 2010) ...............................................13

*Higgins v. Harold-Chevrolet-Geo, Inc.,*
    2004 WL 2660923 (Minn. Ct. App. Nov. 23, 2004) ..............................20

*Holmes v. Pension Plan of Bethlehem Steel Corp.,*
    213 F.3d 124 (3d Cir. 2000)......................................................29

*In re Bridgestone/Firestone Inc.,*
    288 F.3d 1012 (7th Cir. 2002) .............................................19, 23

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig. ("Ignition Switch I"),*
    174 F.R.D. 332 (D.N.J. 1997)....................................................22

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008)..........................................11, 24, 29

*In re LifeUSA Holding, Inc.,*
    242 F.3d 136 (3d Cir. 2001)...............................................17, 24

*In re Mercedes-Benz Tele Aid Contract Litig.,*
    257 F.R.D. 46 (D.N.J. 2009).....................................................28

*In re Neurontin Mktg., Sales Practices & Prod. Liab. Litig.,*
    257 F.R.D. 315 (D. Mass. 2009)..................................................25

*In re Warfarin Sodium Antitrust Litig.,*
    212 F.R.D. 231 (D. Del. 2002) ...........................................23, 24

*In re Warfarin Sodium Antitrust Litig.,*
    391 F.3d 516 (3d Cir. 2004)...............................................23, 24

*In re Wash. Mut., Inc.,*
    2010 WL 3238903 (Bankr. D. Del. Aug. 13, 2010) ............................20

*Johnston v. HBO Film Mgmt, Inc.,*
    265 F.3d 178 (3d Cir. 2001)......................................................17

*Jordan v. Paul Fin., LLC,*
    2009 WL 192888 (N.D. Cal. Jan. 27, 2009) ....................................14

*Lester v. Percudani,*
    217 F.R.D. 345 (M.D. Pa. 2003)..................................................17

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ................................................................21, 28

*McLaughlin  v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008).......................................................................26

*Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*,
2010 WL 8250837 (Del. Super. Ct. Nov. 5, 2010)....................................19

*Montgomery v. Achenbach*,
2007 WL 1784080 (Del. Super. May 17, 2007) ........................................16

*Nemec v. Shrader*,
991 A.2d 1120 (Del. 2010) .........................................................................28

*New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington*,
825 F. Supp. 1180 (D. Del. 1993)...............................................................19

*Newman v. RCN Telecom Servs., Inc.*,
238 F.R.D. 57 (S.D.N.Y. 2006) ..................................................................15

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001)........................................................................29

*Nieves v. All Star Title, Inc.*,
2010 WL 2977966 (Del. Super. Ct. July 27, 2010), *aff'd*, 21 A.3d 597 (Del. 2011) ..............15

*Oliver v. Boston Univ.*,
2000 WL 1091480 (Del. Ch. July 18, 2000)...............................................25

*Oshana v. Coca-Cola Co.*,
472 F.3d 506 (7th Cir. 2006) ................................................13, 15, 17, 27

*Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*,
710 F. Supp. 2d 458 (D. Del. 2010).............................................................22

*Peil v. Speiser*,
806 F.2d 1154 (3d Cir. 1986).......................................................................26

*Pilgrim v. Universal Health Card, LLC*,
660 F.3d 943 (6th Cir. 2012) .......................................................................21

*Rosenstein v. CPC Int'l, Inc.*,
1991 WL 1783 (E.D. Pa. Jan. 8, 1991) ........................................................18

*Slapikas v. First Am. Title Ins. Co.*,
250 F.R.D. 232 (W.D. Pa. 2008) .................................................................28

*Smith v. Berg*,
    2001 WL 1169106 (E.D. Pa. Oct. 1, 2001)............................................................17

*Spark v. MBNA Corp.*,
    178 F.R.D. 431 (D. Del. 1998) ...............................................................26, 28

*State Farm Mut. Auto Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)................................................................................21

*Sullivan v. DB Investments, Inc.*,
    2011 WL 6367740, (3d Cir. Dec. 20, 2011) .......................................24, 25

*Thorogood v. Sears, Robuck & Co.*,
    547 F.3d 742 (7th Cir. 2008) .................................................................26

*Total Holdings USA, Inc. v. Curran Composites, Inc.*,
    999 A.2d 873 (Del. Ch. 2009)................................................................20

*Travelers Indem. Co. v. Lake*,
    594 A.2d 38 (Del. 1991) .........................................................................22

*Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*,
    319 F. App'x 137 (3d Cir. 2009) ...........................................................20

*United States v. Price*,
    688 F.2d 204 (3d Cir. 1982)...................................................................16

*Van Tassell v. United Mktg. Grp., LLC*,
    795 F. Supp. 2d 770 (N.D. Ill. 2011) .....................................................20

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) .............................................................27

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)........................................................13, 15, 16, 24

*Williams v. Balcor Pension Investors*,
    150 F.R.D. 109 (N.D. Ill. 1993).............................................................14

*Zinser v. Accufix Research Inst. Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...............................................................30

## RULES

Fed. R. Civ. P. 23................................................................................11, 19

Fed. R. Civ. P.  26(a)(2)(B) ...............................................................30

Fed. R. Civ. P. 23(a) .................................................................2, 11, 12

Fed. R. Civ. P. 23(b) ...........................................................................................................11

Fed. R. Civ. P. 23(b)(2)..............................................................................................2, 15, 16

Fed. R. Civ. P. 23(b)(3)........................................................................................2, 15, 17, 29

**STATUTES**

6 Del. C. § 2513 ...................................................................................................................22

**OTHER AUTHORITIES**

12 C.F.R. § 560.101 (1997) .................................................................................................16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHNATHAN AND TRUDE YARGER, a married couple,<br><br>       Plaintiffs,<br><br>   v.<br><br>ING BANK, FSB D/B/A/ ING DIRECT,<br><br>       Defendant. | Civil Action No.:  1:11-cv-00154-LPS |

**DEFENDANT'S BRIEF IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

Defendant ING Bank, fsb d/b/a ING DIRECT ("ING") respectfully submits this brief in opposition to Plaintiffs' Motion for Class Certification.

## I.    INTRODUCTION

This action concerns ING's advertising of a residential mortgage loan feature known as "Rate Renewal," which is a simpler and less costly alternative to a complete loan refinancing transaction.  Plaintiffs Johnathan and Trude Yarger obtained an ING first mortgage in 2006 through a Minnesota-based broker, who was not affiliated with or employed by ING, to finance their purchase of a condominium in Shakopee, Minnesota.  ING is a federal savings bank that has sizeable call centers and mortgage servicing centers in Minnesota and California, as well as facilities in Delaware.

The Yargers twice utilized Rate Renewal, reducing their monthly payment by a total of $168.69 and their interest rate down to 4.25%. The third time they attempted a Rate Renewal, they failed to qualify because their condominium had declined in value and they did not satisfy ING's loan-to-value ratio ("LTV") criteria.  This lawsuit followed.  The Yargers attack two aspects of Rate Renewal:  (1) the potential change in the cost over time, and (2) the imposition

and/or modification of eligibility standards. They allege that ING "guaranteed" that Rate Renew would remain available and unchanged "for the life of their loan" – even though these words never appear in any ING marketing materials and were never uttered during the Yargers' telephone conversations with ING, all of which were recorded. The Yargers seek to represent a putative nationwide class of over 76,000 borrowers "who purchased an Easy Orange or Orange Loan from October 2005 until May 2009." First Am. Class Action Compl.("Compl.")¶ 53 (D.I. 36). The Yargers seek to apply Delaware law to each of these tens of thousands of transactions in 51 jurisdictions – despite the choice of Minnesota law in their mortgage, their Minnesota residency, the location of their property in Minnesota, their dealings with an independent Minnesota mortgage broker, and their primary dealings with ING through its call centers in Minnesota and California.

## II.     NATURE AND STAGE OF PROCEEDINGS

This lawsuit was filed on January 21, 2011 in the Superior Court of Delaware and removed to this Court on February 18, 2011. (D.I. 1). ING answered the Class Action Complaint and First Amended Class Action Complaint. (D.I. 9, 39). Following written and deposition discovery, Plaintiffs filed their Motion for Class Certification on January 10, 2012.

## III.     SUMMARY OF ARGUMENT

1.     Plaintiffs cannot satisfy the Rule 23(a) requirements of numerosity, commonality, or typicality.

2.     Plaintiffs are not entitled to injunctive class relief under Rule 23(b)(2).

3.     Plaintiffs' putative class claims fail both the predominance and superiority tests of Rule 23(b)(3).

## IV.    STATEMENT OF FACTS

**A.    ING's Products and Marketing**

      1.    <u>Orange Mortgage, Easy Orange Mortgage and Rate Renewal</u>

ING is a portfolio lender that originates and services two types of first mortgage loans: the Orange Mortgage ("OM") and the Easy Orange Mortgage ("EZO").  *See* Kendall Aff. ¶ 8 (Ex. 2).  During the relevant time period, ING originated 74,124 OM loans and 2,363 EZO loans.  *Id.* ¶ 16.  The OM is an adjustable rate mortgage loan with a 30-year amortization period and an initial fixed-rate period of five or seven years.  *See* Kendall Dep. 55:2-10 (Ex. 1).  ING's Rate Renewal feature is not mentioned in any OM loan origination documents.  *Id.* at 56:15-57:13.

In July 2008, ING launched the EZO loan, which requires bi-weekly electronic payments.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[1]  The EZO loan has a 30-year amortization period, but at the end of the five- or ten-year fixed-rate period, the full balance becomes due.  Kendall Dep. 55:11-17; ▮▮▮▮▮▮▮▮.  Because of the balloon feature, the EZO is not appropriate for many customers, ▮▮▮▮▮▮▮▮, and ING imposes stricter underwriting guidelines.  Kendall Dep. 56:2-6.  Beginning in January 2009, Rate Renewal was included as a feature of EZO loans.  ▮▮▮▮▮▮▮▮ ▮▮▮▮.  Customers who applied for an EZO loan were given an "EZO Fact Sheet," and those applying in January 2009 or later executed a Rate Renewal Addendum. Kendall Aff.¶ 30; Hagen Aff. ¶ 22 (Ex. 5); *see* Ex. 5F (EZO Fact Sheets);Ex. 2D, at 1974 (Rate Renewal Addendum).  These documents do not "guarantee" that Rate Renewal will be available "for the life of the loan" or that the cost and eligibility requirements will not change over time.  In fact, they explain that these elements <u>are</u> subject to change.  *See* Exs. 2D & 5F.

---

[1] Subsequent pinpoint citations to documents ING produced in discovery (Exs. 2A-2B, 2G, 4A-4K, and 5A-5F) omit the "ING" and all zeros from the documents' Bates numbers, e.g., a reference to ING00009483 will cite to 9483.

In October 2005, ING "branded" its then-existing note modification program as "Rate Renewal" and allowed customers who qualified to obtain ING's then-current rate for a specified up-front charge. *See* Kendall Aff.¶ 18.A Rate Renewal is a substitute for a refinance transaction, which usually would require payment of significantly higher closing costs. *Id.* The Rate Renewal program is administered from Minnesota, California, and Delaware. *Id.* ¶¶ 19-20.

The Rate Renewal program has undergone numerous refinements over the years, including changes to the cost and eligibility requirements. When the program began, ING charged customers $500 to cover operational costs. *See id.* ¶ 24; Kendall Dep. 70:10-72:6. ING later realized it had underestimated the true cost of the program and increased the charge to $750 in May 2008. *See* Kendall Dep. 77:21-82:4; Kendall Aff. ¶ 24. A year later, ING adjusted the cost to an amount equal to the customer's monthly mortgage payment (or two bi-weekly payments for EZO customers). Kendall Aff.¶ 24. Similarly, ING's eligibility requirements have changed over time. *See id.*¶¶ 25-26, ███████████. Applicable law does not require ING to affirmatively disclose these changes for Rate Renewals. *See id.* ¶ 23.

ING markets its products through direct mail, emails, call centers, and its website. ING has sent varying messages to different recipients over time. For example, on occasion, ING has marketed Rate Renewal only to a subset of OM customers, such that some OM customers may not have been aware of it. *See* Lugar Dep. 91:5-11, 95:2-4 (Ex. 3). ████████████ ████████████████████████████████████ ████████████████████████. ING's marketing materials are designed to provide customers with enough information to "drive them" to contact ING by phone, so that customers can have a more detailed conversation with ING sales

associates. *See* Kendall Dep. 106:3-14. If customers opt to proceed with a loan transaction, then loan documents also contain salient details.

2. Oral Representations Regarding Rate Renewal

Although ING attempts to train sales associates – the employees that handle customer calls, Battaglia Aff. ¶ 7 (Ex. 4) – to convey a consistent message, every conversation with a customer is unique, and it is not possible to know what each customer heard about Rate Renewal without listening to recordings of each conversation. *See* Kendall Dep. 40:7-42:16. ING's sales associates do not use scripts, which are "too cookie cutter and . . .provide[] a bad customer service." Lugar Dep. 213:15-214:7; *see* Kendall Dep. 132:10-18. Written guidelines for the sales associates – known as "training flashes" – are basic and provide "general talking points." Lugar Dep. 209:12-20, 211:11-14; *see* Ex. 4A (Training Flash). Sales associate training evolves over time. Battaglia Aff.¶ 7. Sales associates are encouraged to pay attention to each customer's unique circumstances, "exercise good judgment," and determine what is in the customer's and ING's best interests. Kendall Dep. 151:22-152:1. Some sales associates might tell particular customers that the cost of a Rate Renewal could change, while others may not. Kendall Dep. 105:16-21. Similarly, sales associates are authorized to determine whether a Rate Renewal exception should be made on a case-by-case basis. *See* Battaglia Aff.¶ 7.

3. Written Representations Regarding Rate Renewal

a. *ING's Website*. ING's website is designed to inform current customers and to attract new customers. *See* Kendall Dep. 131:20-132:9. The messaging is updated continuously. *See* Battaglia Aff. ¶ 10. For current customers, the "Smart Sell" system allows ING to post specific messages tailored to each individual customer based on various factors, which change constantly. *See* Kendall Dep. 26:2-5; Lugar Dep. 69:1-21. As a result, ING

5

mortgage customers receive different messages when they log into their accounts, and putative class members would have seen different Rate Renewal-related messages, or no messages at all.

        b.    *E-mails*.  ING has sent at least four types of emails to customers that have addressed Rate Renewal.  "Pipeline Emails" are sent to conditionally pre-approved OM and/or EZO applicants.  Battaglia Aff. ¶ 11.  These emails do not address the cost of a Rate Renewal. *See id.* & Ex. 4C.  Most (but not all) of the emails include qualification/ eligibility language and contain offer deadlines, thus indicating that the specific loan details are subject to change if the offer expires.  Battaglia Aff . ¶ 11 & Ex. 4C. "Cross-Sell Emails" are sent to current non-mortgage customers and direct recipients to call ING or to visit its website to learn more about EZO or OM loans.  *See* Battaglia Aff. ¶ 12 & Ex. 4D.  Some include the amount of the current Rate Renewal charge, *see* Ex. 4D, at 5899, 720, while others do not mention the cost, *see id.* at 6233, 7021, 6600.  All indicate that eligibility requirements apply, but the specific language varies.  Battaglia Aff. ¶ 12.  *Compare* Ex. 4D, at 5899, 720 with *id.* at 6233, 7021.

    "Acquisition Emails" are sent to prospective customers.  Some refer to the Rate Renewal cost in general terms, *see* Ex. 4E, at 7138, while others do not mention the Rate Renewal charge, *see id.* at 6530, 7214.  Battaglia Aff. ¶ 13.  All of these emails indicate that eligibility requirements apply to Rate Renewals.  *See id.* & Ex. 4E. "Retention Emails" are sent only to current Rate Renewal-eligible customers in an attempt to retain their business.  Battaglia Aff. ¶ 14.  Some address eligibility requirements, *see* Ex. 4F, at 5674, 5702.  Others do not, s*ee id*. at 5461, 5606.  All of the Retention Emails indicate the current cost of a Rate Renewal and contain offer deadlines, indicating that the cost (and other details) could change if the recipient allows the deadline to expire.  *See* Battaglia Aff. ¶ 14 & Ex. 4F.

c.    *Direct Mail*.  "Retention Direct Mailers" are sent only to Rate Renewal-eligible current mortgage customers.  Battaglia Aff. ¶ 15.  They include offer deadlines and indicate the current Rate Renewal cost.  *See id.* & Ex. 4G.  Some state that rates may change at any time.  Battaglia Aff. ¶ 15 & Ex. 4G.  ING sends "EZO Postcards" to prospective customers and current non-mortgage customers.  Battaglia Aff. ¶ 16.  Due to limited space, these postcards include only basic EZO information.  *Id.*  Some list the current Rate Renewal cost, *see* Ex. 4H, at 35066, 35144, while others do not, *see id.* at 38659.  Some include eligibility language, *see id.* at 35144, while others do not mention qualifications, *see id.* at 35066, 38659.  They encourage recipients to apply for an EZO or to visit ING's website to learn more, and they do not include any offers.  *See* Battaglia Aff. ¶ 16 & Ex. 4H.  Finally, ING sends "Preapproval Direct Mailers" to prospective customers who are pre-approved for a loan.  *See* Battaglia Aff. ¶ 17.  These documents include the current Rate Renewal cost, and expressly state: "If at the time you accept this offer, you no longer meet our initial criteria, or otherwise fail to meet our full eligibility requirements, . . . the offer may be revoked."  *See id.* & Ex. 4I.

d.    *Monthly Statement Messages*.  ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ █ ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

_____

[2] ███████████████████████████████████████████████████████

███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████

4.    <u>Loan Documentation and Offers</u>

*a.*    *<u>Offer Letters</u>*.  The package ING sends to conditionally approved loan applicants includes an offer letter.  *See* Hagen Aff.¶ 11.  During the proposed class period, ING sent at least fifty-four different types of offer letters to OM and EZO applicants.  *See id.* ¶¶ 11, 14, 16, 18-20.

- Certain "Alternative" OM Offer Letters never addressed Rate Renewal, and the "standard" OM Offer Letters did not address Rate Renewal at various times during the class period.  *See* Hagen Aff.¶¶ 15, 21 & Exs. 5A, 5C-5E.

- The OM Offer Letters that addressed Rate Renewal did not mention the cost.  Hagen Aff. ¶ 15.  They all included offer deadlines and stated that eligibility requirements applied, and some stated that such requirements might change, *e.g.*, Ex. 5A, at 35651.  *See* Hagen Aff.¶ 15.

- Some EZO Offer Letters mentioned the cost for a Rate Renewal in general terms, *e.g.*, Ex. 5B, at 8924 ("nominal charge"), while others did not address the cost, *e.g.*, *id.* at 36342.  *See* Hagen Aff. ¶ 17& Ex. 5B.

- All EZO Offer Letters addressed eligibility requirements and contained offer deadlines, but the specific language varied.  Hagen Aff. ¶ 17. *Compare* Ex. 5B, at 8924 *with id.* at 36342.

b.    *EZO Fact Sheet*.  The loan package sent to EZO applicants also includes an "EZO Fact Sheet," which has changed over time. Battaglia Dep. 47:24-48:8 (Ex. 6); Hagen Aff. ¶ 22.  Some versions sent during the proposed class period referred to a "nominal charge" or a "small charge," while others identified the current Rate Renewal cost.  *See* Hagen Aff. ¶ 22 & Ex. 5F.  All versions indicated that the customer must meet certain eligibility requirements, and some stated that the requirements could change, *e.g.*, Ex. 5F, at 8930.  *See* Hagen Aff. ¶ 22.

c.    *Rate Renewal Addenda*.  Beginning in January 2009, EZO customers executed a Rate Renewal Addendum.  *See* Kendall Aff. ¶ 30.  This document evolved over time, but always stated that the cost and eligibility requirements were subject to change.  *Id.* ¶ 30; *see, e.g.*, Ex. 2D, at 1974.

**B.    The Yargers' Unique Transaction History**

Plaintiffs Johnathan and Trude Yarger are residents of Minnesota.  Compl.¶ 31 (D.I. 36). The Yargers first learned about the OM from their mortgage broker, Jim Wasieleski, with City West Capital.  *Id.* ¶ 37.  The Yargers claim their broker told them that ING offered a "flat fee Rate Renewal Program" that would be offered for "the life of their loan," and that the only component subject to change was the interest rate.  Pls.' Interrog. Resps. at pp. 5-6 (Ex. 8). However, the Yargers did not receive anything in writing about ING from their broker prior to closing their loan.  J. Yarger Dep. 93:10-13 (Ex. 7).  The Yargers understand that Mr. Wasieleski is not an ING employee.  *Id.* at 133:24-134:6.  On May 15, 2006, the Yargers closed an OM loan with a fixed interest rate for five years.  *See* Compl. ¶ 36 (D.I. 36); Ex. 2A.  The Yargers admit they know nothing about the EZO loan product.  J. Yarger Dep. 71:14-72:13.

9

The Yargers twice utilized the Rate Renewal feature.  They allege that during the Spring of 2008, they received a "mailer" from ING offering them a Rate Renewal.[3]  Ex. 8, at p. 6.  ██

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████[4]

---

[3]  The Yargers claim they did not retain this mailer and did not produce it in discovery.  They could not specifically recall what the mailer said.  J. Yarger Dep. 101:11-103:6.

[4]  ██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

On August 23, 2010, Mr. Yarger contacted ING to request paperwork for a third Rate Renewal.  Compl.¶ 44 (D.I. 36).He had no objection to paying the charge of one-month's payment, but the Yargers were ineligible for another Rate Renewal at that time because of a decline in the value of their condominium.  *Id.*; *see* Kendall Aff. ¶¶ 25-26, ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████.  They declined both options and opted to file a lawsuit.

The Yargers now allege that an ING sales associate assured them that the $750 "Rate Renew Guarantee" would be available for "the life of the loan." Compl. ¶ 40 (D.I. 36). However, ING made no such assurance in phone calls with the Yargers, all of which were recorded.  *See* Kendall Aff. ¶ 20-21; ██████████.  Moreover, Mr. Yarger does not recall ING using the word "guarantee," either verbally or in writing, J. Yarger Dep. 96:20-97:12, and he cannot swear that any sales associate ever used the term "life of the loan."  *Id.* at 106:4-107:23.

## V.    <u>LEGAL STANDARD</u>

Plaintiffs must demonstrate that the proposed class meets the four requirements of Federal Rule of Civil Procedure 23(a), and one of the requirements of Rule 23(b).  Fed. R. Civ. P. 23; *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 315–16 (3d Cir. 2008).  Class certification analysis under Rule 23 requires a "careful, fact-based approach."  *Id.* at 326.  In deciding the certification issue, the Court need not accept Plaintiffs' conclusory or generic

---

ING made an exception, cancelled the Yargers' September 2 Rate Renewal request, and granted them a Rate Renewal at the lower rate – all without charging them for another Rate Renewal.  *Id.*

allegations, but instead should conduct a "rigorous analysis" into whether Plaintiffs have satisfied their burden. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

## VI.    ARGUMENT

Plaintiffs' brash assertion that the Rate Renewal feature is a "guarantee" and that they were "promised" the cost and eligibility requirements would never change is a gross mischaracterization.    At no point in time has ING guaranteed that the cost or eligibility requirements of the Rate Renewal feature will never change.  The Yargers' recorded telephone conversations prove that they understood the impermanence of the Rate Renewal features. ING's marketing materials evolved over time, and different customers received communications with varied language.  The Yargers' individual situation illustrates that resolution of the dispute will require analysis of which written materials each class member received, what each class member relied upon, what each class member was told in oral communications, and whether each class member suffered harm.  Class certification is therefore improper.

**A.    Plaintiffs Cannot Satisfy Rule 23(a).**

Plaintiffs must establish (1) that the class is so large that joinder of all members is impracticable; (2) that there are one or more questions of law or fact common to the class; (3) that the named plaintiffs' claims are typical of the class; and (4) that the class representatives will fairly and adequately protect the interests of other class members.   Fed.R. Civ. P. 23(a). Plaintiffs must *provide facts* to satisfy these requirements; "'[m]ere repetition of the language of the Rule is inadequate.'"  *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977).

1.    Numerosity Fails for Lack of an Ascertainable Class.

Plaintiffs' proposed class definition -- "all individuals who purchased an Easy Orange or Orange Loan from October 2005 until May 2009" -- is indefinite and not sufficiently

ascertainable, which defeats numerosity. The proposed class must be limited to individuals who have been harmed. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514-15 (7th Cir. 2006) (affirming denial of class certification in a false advertising case where the proposed class was comprised of all purchasers of Diet Coke). The inclusion of consumers who have no grievance and/or were not deceived by the challenged advertising defeats class certification. *Id.*

Plaintiffs' class definition fails to take into consideration whether class members have been subjected to deceptive communications or have suffered any damages. In the vast majority of situations, departures from ING's portfolio have nothing to do with the Rate Renewal program. Kendall Aff.¶ 15. ING does not offer a 30-year conventional, fixed-rate mortgage, and it does not allow a cash-out refinancing in conjunction with a Rate Renewal. *Id.* Therefore, any borrowers who wish to lock-in historically low interest rates or withdraw equity from their home would have to refinance elsewhere. Such borrowers suffered no harm if they never knew about or never utilized Rate Renewal. Yet, they are improperly embedded in the class definition. *See Heisler v. Maxtor Corp.,* 2010 WL 4788207, at *2-3 (N.D. Cal. 2010) (Proposed class definition failed to include objective limitations and was unascertainable).

    2.   <u>Unique Facts Surrounding Plaintiffs' Loan Transactions Defeat Commonality</u>.

Commonality requires that the class members' claims "depend upon a common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). The key issues in this case are <u>not</u> capable of class-wide resolution: whether ING's conduct constitutes fraud; whether each borrower's reliance was justifiable; whether each borrower actually suffered any damages; and whether ING was unjustly enriched. *See* Compl. ¶ 58 (D.I. 36). Resolution of these questions requires individualized inquiry into, among other

13

issues, what each class member heard or saw, relied upon, and whether that reliance was reasonable. *See infra* Section VI.B.2.

Commonality cannot exist where (as here) a purported class includes a wide range of individuals subject to different communications or where the class involves extensive diversity. *Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 566 (W.D. Wash. 2001) (commonality lacking where the purported class included "such a wide range of employees, subject to such a wide range of criteria"). The purported class includes over 76,000 borrowers in 51 jurisdictions over a three-and-a-half year time period who received widely varying marketing materials, had unique oral communications with ING (if any), and relied upon different factors in making borrowing decisions. References to Rate Renewal vary significantly based upon what type of material a class member saw or received, when they saw or received it, and whether a broker was involved. The language about Rate Renewal varies in ING's written materials, loan documents, and on its website, which includes specific messaging tailored to each individual customer based on constantly changing factors. *See, e.g.*, Kendall Dep. 26:2-5. Answering the alleged "common" questions for the Yargers would by no means answer them for all putative class members.

3.    The Yargers Are Not Typical of the Proposed Class.

The Yargers are atypical because they dealt with a third-party mortgage broker and relied solely on statements made by him – not on ING's marketing materials. Compl. ¶ 37 (D.I. 36); Ex. 8, at pp. 5-6. This crucial fact is not a common experience shared by all putative class members. *See Donaldson*, 205 F.R.D. at 568; *Jordan v. Paul Fin., LLC*, 2009 WL 192888, at *5 (N.D. Cal. Jan. 27, 2009) (plaintiff's working relationship with mortgage broker, prior experience with mortgage products, and possibility that he did not read loan documents defeats typicality); *Williams v. Balcor Pension Investors*, 150 F.R.D. 109, 114 (N.D. Ill. 1993) (plaintiff

was atypical because he relied on oral representations separate from the allegedly misleading document that formed the basis of the class claims).

Further, the Yargers are atypical because they were fully informed about the Rate Renewal program. ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████. Likewise, Mr. Yarger cannot claim that eligibility requirements were a surprise, as he ████████████████████████████ ████████████████████████████████ (2) acknowledged in his deposition that ING had imposed other conditions on the Rate Renewal, which Plaintiffs do not complain about in this lawsuit. *See* J. Yarger Dep. 148:15-152:7.

These undisputed facts defeat typicality for two reasons. First, typicality is lacking where the class representative knows the truth and nonetheless purchases a product or enters a relationship with the defendant. *See Oshana*, 472 F.3d at 514 (finding the Plaintiff atypical where she did not see any advertisements during the relevant period and knew fountain and bottled Diet Coke were different). Second, the Yargers' claims are subject to a unique defense: the voluntary payment doctrine. *See Nieves v. All Star Title, Inc*., 2010 WL 2977966, at *6 (Del. Super. Ct. July 27, 2010) ("'Where money has been voluntarily paid with full knowledge of the facts, it cannot be recovered on the ground that the payment was made under a misapprehension of the legal rights and obligations of the person paying . . . .'"), *aff'd*, 21 A.3d 597 (Del. 2011); *see also Newman v. RCN Telecom Servs., Inc*., 238 F.R.D. 57, 78 (S.D.N.Y. 2006) (finding named plaintiff atypical because he continued to pay his bill without disputing allegedly fraudulent charges).

**B.    Plaintiffs Cannot Satisfy Either Rule 23(b)(2) or Rule 23(b)(3).**

1.    No single injunction will satisfy Rule 23(b)(2).

"Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 131 S.Ct.at 2557. Certification of a 23(b)(2) class is not proper "when each individual class member would be entitled to" individualized injunctive, declaratory and/or monetary relief. *Id.* Plaintiffs' demand fails this test for at least four reasons. First, Plaintiffs expressly seek individualized damages. Compl. ¶23 (D.I. 36). Second, Rule 23(b)(2) does not apply where "each individual class member would be entitled to a different injunction or declaratory judgment against [ING]." *Wal-Mart*, 131 S.Ct. at 2557. Plaintiffs' requested injunction would grant each class member the Rate Renewal deal that was in effect at the time s/he closed on his or her loan, *see* Compl. ¶ 64 (D.I. 36), which would effectively freeze deal terms for thirty years. In addition to the fact that the Third Circuit disfavors mandatory injunctions, *see United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982), this request would require tailoring the injunctive relief for each class member. Third, the requested injunction is improper under applicable law. Offers with no expiration date are not indefinite in nature, but must remain open only for a "reasonable time," which typically is no more than one year. *See Montgomery v. Achenbach*, 2007 WL 1784080, at *2 (Del. Super. May 17, 2007). Finally, the requested injunctive relief is improper because ING, as a bank, operates in a heavily regulated industry and cannot be stripped of its safety and soundness duty to examine borrowers' qualifications and eligibility. *See* 12 C.F.R. § 560.101 (1997) ("The [saving association's] lending policies **must** establish . . . prudent underwriting standards, including loan-to-value limits, that are clear and measurable.") (emphasis added); Kendall Aff. ¶ 23.

2.    <u>Rule 23(b)(3) Certification is Improper for Lack of Predominance</u>.

Certification under Rule 23(b)(3) is proper only where "questions of law or fact common to class members predominate over any questions affecting only individual members" and class treatment "is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In this case, neither requirement is satisfied.

Adjudication of Plaintiffs' claims will require evidence of each borrower's understanding of, and expectations for, their individual loans, as well as the communications each had with ING and with any non-party brokers.[5]  Some borrowers contacted ING by phone, whereas others did not.  *See* Kendall Aff. ¶ 20.  Telephone conversations varied based upon the individual's circumstances and the sales associates' exercise of discretion.  *See* Battaglia Aff. ¶ 7.  Some borrowers accessed ING's website, whereas others did not. *See* Kendall Aff. ¶ 20.  Courts routinely deny class certification in false advertising cases, especially those involving oral communications, because of the individualized issues.  *See Johnson v. HBO Film Mgmt*, *Inc.*, 265 F.3d 178, 190 (3d Cir. 2001) ("[A]n action based substantially on oral rather than written communications is inappropriate for treatment as a class action."); *In re Life USA Holding, Inc.*, 242 F.3d 136, 147 (3d Cir. 2001) (vacating class certification where pre-sale presentations were made by independent agents and were neither scripted nor uniform); *Oshana*, 472 F.3d at 514 (denying certification where some class members did not see the misleading advertisements and some "knew the truth," in spite of the advertisements); *Lester v. Percudani*, 217 F.R.D. 345, 350, 352 (M.D. Pa. 2003) (denying certification because plaintiffs that "received varying oral presentations" could "not establish common injury"); *Smith v. Berg*, 2001 WL 1169106, at *4

---

[5]  More than **half** of the proposed class members obtained their ING loans through the independent broker channel.  Kendall Aff. ¶ 16.

(E.D. Pa. Oct. 1, 2001) (denying certification because "oral and non-uniform written misrepresentations make class treatment inappropriate"); *Rosenstein v. CPC Int'l, Inc.*, 1991 WL 1783, at *4-5 (E.D. Pa. Jan. 8, 1991) (denying certification where it was unclear "who purchased [the defendant's product] in reliance of (sic) the allegedly fraudulent marketing scheme").

ING did not utilize uniform written marketing materials, and Plaintiffs' talismanic recitation of terms like "uniform" and "centralized" are not supported by any facts. ING markets its products via direct mail, emails, messaging on its website and in monthly statements, oral communications with customers, loan documents, and offer letters. Each customer received different messages about Rate Renewal, as demonstrated by this sampling:

- **Emails**. ING sends its various categories of emails only to specific types of customers, and some are sent only to Rate Renewal-eligible recipients. Some emails address the cost of Rate Renewal in general terms, some state a specific cost, and others do not indicate that a charge applies. Certain emails state that eligibility requirements apply (with varying language), while others do not. Some emails contain offer deadlines, whereas others do not. *See* Battaglia Aff. ¶¶ 11-14; *supra* Section IV.A.3.b.

- **Direct Mail and Monthly Statement Messages**. Some mailers state that eligibility requirements may change. Some mailers and monthly statement messages do not mention eligibility because they are sent only to customers who are Rate Renewal-eligible. Others do not include an offer and instead provide basic information and invite the recipient to contact ING for more details. Regarding cost, some mailers include the actual charge, some use general language, and some do not mention a cost. *See* Battaglia Aff. ¶¶ 15-24; *supra* Section IV.A.3.c-d.

- **Monthly Statement Messages.** ██████████████████████████████████ ████████████████████████████████████████████████████████████

- **Loan Documentation/Offer Letters**. Some offer letters do not mention Rate Renewal. Others mention the cost in general terms, whereas others do not address cost. All offer letters refer to eligibility requirements, but with varying language, and some indicate that requirements are subject to change. *See* Hagen Aff. ¶¶ 14-21; *supra* Section IV.A.4. EZO borrowers execute a Rate Renewal Addendum that explicitly states that the cost and eligibility requirements could change. *See* Kendall Aff. ¶ 30; *supra* Section IV.A.4.

- **Website Rate Renewal Icon**. ████████████████████████████████ █████████████████████████████████████████████

██████████.  Different class members would have seen different Rate Renewal-related messages.  *See* Kendall Dep. 26:2-5; Lugar Dep. 69:1-21; *supra* Section IV.A.3.a.

- **Telephone Conversations**.  ING sales associates do not use scripts.  They have the ability to make Rate Renewal exceptions on a case-by-case basis. *See supra* Section IV.A.2.  As such, all communications with sales associates were necessarily unique.

In short, the Court will have to examine the representations that each borrower received, and it cannot adjudicate the claims on a class-wide basis.  This Rule 23 defect is also reflected in the indefinite class definition, which impermissibly includes at least the following types of borrowers: those who have never heard of Rate Renewal; those who never made a Rate Renewal request; those who knew about Rate Renewal but clearly understood that cost and eligibility requirements could change; those who were ineligible for a Rate Renewal due to poor payment history; those who paid off or refinanced their loan without ever making a Rate Renewal request; those who have defaulted; those who have benefited from changes in the Rate Renewal cost and eligibility requirements; and those who knowingly paid the applicable charges for a Rate Renewal without complaint.

  a.   *Applicable Conflicts-of-Law Principles Disallow the Application of Delaware Law to All Borrowers.*

Plaintiffs propose a nationwide class of over 76,000 ING residential mortgage borrowers located in 51 jurisdictions.  *See* Kendall Aff. ¶ 15.  This Court must utilize Delaware's choice-of-law rules, which require determining whether an actual conflict exists between the laws of the competing jurisdictions.  *New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington*, 825 F. Supp. 1180, 1185 (D. Del. 1993); *Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837, at *4 (Del. Super. Ct. Nov. 5, 2010).  State consumer protection laws "vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *In re Bridgestone/Firestone Inc.*, 288 F.3d 1012, 1017-18 (7th Cir. 2002).  Delaware law and the law of the Yargers' home state, Minnesota, conflict significantly, in that

the Delaware Consumer Fraud Act ("DCFA") does not require proof of reliance, whereas reliance is a necessary element to recover under the Minnesota Consumer Fraud Act. *Higgins v. Harold-Chevrolet-Geo, Inc.*, 2004 WL 2660923, at *3-4 (Minn. Ct. App. Nov. 23, 2004).

           *i.*     *ING's Loan Documents Require Application of the Laws Where Each Borrower's Property is Located.*

Where the parties agree to a choice-of-law provision, that choice should be enforced, *see Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*, 319 F. App'x 137, 140-41 (3d Cir. 2009), unless there is "'no reasonable basis'" for it, or "application would be contrary to a fundamental policy of a state with 'a materially greater interest.'" *Total Holdings USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 882 (Del. Ch. 2009). The Yargers contractually agreed to apply Minnesota law. Their Note and Note Modification Agreements do not contain any choice-of-law provision, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, whereas their mortgage provides: "This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located." Ex. 2A, at 18525.[6] The parties had a reasonable basis for choosing to apply the law of the state where the property is located, and Delaware does not have a "materially greater interest" than Minnesota in the Yarger's residential mortgage transaction. *See In re Wash. Mut., Inc.*, 2010 WL 3238903, at*6 (Bankr. D. Del. Aug. 13, 2010) (New York had the most significant relationship to claims stemming from a New York residential mortgage

---

[6] Plaintiffs' reliance on the choice-of-law provision on ING's website is misplaced. The "Terms and Conditions for Use of this Web Site" are limited to use of ING's website and do not apply to its products: "by using this web site (www.ingdirect.com) and the online services offered by ING DIRECT, you agree to these Terms and Conditions." Plaintiffs' residential mortgage, which was obtained through a broker in Minnesota, has no relationship to ING's website, and the Yargers have never alleged that they used ING's website to complete a Rate Renewal. *See Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 791 (N.D. Ill. 2011) (declining to apply Delaware choice-of-law clause governing website use when no evidence was offered that plaintiffs saw the clause). This is yet another highly individualized and customer-specific fact that precludes certification.

transaction, even though some of the defendant's wrongful conduct likely occurred elsewhere); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig. ("Ignition Switch I")*, 174 F.R.D. 332, 348-49 (D.N.J. 1997) (laws of plaintiffs' home states applied even though Ford's headquarters are located in Michigan, where any relevant decisions were made and any misrepresentations originated).  Indeed, states have a compelling interest in applying their own consumer protection laws to transactions that occur within their respective boundaries.  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders"); *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2012) ("the State with the strongest interest in regulating [deceptive or fraudulent] conduct is the State where the consumers—the residents protected by *its consumer*-protection laws—are harmed by it."); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591-93 (9th Cir. 2012).  Any holding to the contrary would "permit nationwide companies to choose the consumer-protection law they like best by locating in a State that demands the least."  *Pilgrim*, 660 F.3d at 947.  Moreover, ING's Rate Renewal feature was administered in states other than Delaware, including Minnesota and California, where ING call centers and mortgage servicing centers are located.  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████.

Like the Yargers, every putative class member agreed to apply the law of the situs in their respective mortgages, and over 75% of the putative class agreed to apply <u>only</u> the law of the situs, as their OM notes were silent as to choice of law.  *See* Kendall Aff.¶¶ 16.  Therefore, this Court would need to apply the laws of 51 different jurisdictions to resolve the asserted claims, which precludes certification.  *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 618 (3d Cir. 1996)

(legal and factual differences in plaintiffs' claims, "when exponentially magnified by choice of law considerations, eclipse any common issues in this case"), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *Ignition Switch I*, 174 F.R.D. at 349 ("no federal court ha[s] tried a class action that would require the application of the laws of fifty-one jurisdictions").

> ii.    *The Home States of the Remaining Class Members Have the "Most Significant Relationship."*

The remaining putative class members – less than 25% of the putative class – executed a limited Delaware choice-of-law provision in their promissory notes and a law-of-the-situs provision in their mortgages. *See* Kendall Aff. ¶¶ 16. For these borrowers, Delaware courts apply the "most significant relationship" test, which considers (among other factors) where each borrower received representations and acted in reliance, where the property is located, and where each borrower is to tender performance. *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 41, 44–47 (Del. 1991); *Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 467-69 (D. Del. 2010) (citing RESTATEMENT (SECOND) OF CONFLICTS § 145 (1971)). These factors all point to the borrowers' home states as the most appropriate forum for resolution of claims arising out of their residential mortgage loan transactions.

> b.    *Plaintiffs' DCFA Claim Requires Individualized Inquiries.*

The DCFA should apply only to borrowers whose property is located in Delaware. *See Zeneca*, 710 F.Supp.2d at 473-77 (DCFA did not apply in class action where a Delaware corporation allegedly distributed misleading marketing to clients in other states). However, certification of even a Delaware-only class would be improper for at least three reasons.

First, ING did not engage in any uniform course of conduct. *See* Section IV.A. Second, the DCFA requires a showing by each putative class member that ING made a false

representation and/or omitted a material fact to him/her, *see* 6 Del. C. §2513, and Plaintiffs cannot identify any documents they (much less the entire putative class) received that promise that Rate Renewal will be available "for the life of the loan," use the word "guarantee," or state that the costs and/or eligibility requirements will not change.  They cannot identify any oral misrepresentation or omission made to them by ING and instead concede that they were allegedly misled by a third-party broker.  Determining the false representation/omission of material fact issue necessitates individualized inquiries for every class member.  Third, there is no common injury.  Some putative class members either were not harmed or actually benefitted from the changes to the Rate Renewal program.  For example, some borrowers never sought a Rate Renewal and could not have been damaged by changes in the program.  Some borrowers may have been denied as ineligible, only later to be granted a Rate Renewal when the interest rate was lower, thereby benefiting from the change in requirements.  These are merely two examples of how there is no injury common to all class members.

Plaintiffs rely extensively on *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004). The *Warfarin* case, however, involved an antitrust indirect purchaser, prescription drug MDL, and is not controlling for six separate reasons. First, because *Warfarin* pertained to an antitrust settlement class, not a contested litigation consumer class, the individualized issues and manageability concerns were not vetted according to the *Bridgestone* manageability test. *See id*. at 529 (citing *In re Bridgestone*, 288 F.3d at 1018).  Second, *Warfarin* did not present the same choice-of-law concerns as those present in this case.  In *Warfarin*, the trial court found that the various drug advertising and consumer fraud statutes of the class members' home states had no "material conflicts with the Delaware statute."  *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 n.15 (D. Del. 2002). Furthermore, the court accepted the plaintiffs'

allegation that the challenged conduct "arose, was directed, and emanated from Delaware," *id.*, whereas ING has demonstrated to the contrary.  Third, unlike the antitrust claims at issue in *Warfarin*, Plaintiffs' claims are dependent upon whether putative class members received the allegedly deceptive advertisements, which cannot be proven on a classwide basis. *See id.* at 248, 249 (distinguishing antitrust cases "from cases where liability depends on specific deceptive communications made to individual class members and members' reliance on those communications") (citing *In re Life USA*, 242 F.3d at 144-46).  Fourth, the applicable federal regulator was on record as challenging the marketing statements as deceptive, *see* 212 F.R.D. at 255, whereas in this case there is no allegation or evidence of a primary regulator's opinion that ING's marketing of Rate Renewal is deceptive in any way.  Fifth, the claims in *Warfarin* were brought by multiple plaintiffs in numerous separate cases that were consolidated into MDL proceedings. *Id.* at 237.  Conversely, the present case was brought by a single couple seeking to avoid their home-state of Minnesota's consumer fraud act and asking this Court to disregard their freely agreed upon choice-of-law clause.  Furthermore, while the *Warfarin* plaintiffs brought suit against DuPont for a uniform price support campaign, the Plaintiffs here seek to represent over 76,000 mortgage borrowers from across the nation who established relationships with ING through unique individualized conversations and myriad varying written communications.  And finally, *Warfarin* was decided long before *Hydrogen Peroxide*, 552 F.3d 305 (3d Cir. 2008), and *Wal-Mart*, 131 S. Ct. 2541 (2011), and as such, has severely diminished applicability.

Similarly, *Sullivan v. DB Investments, Inc.* is distinguishable for several reasons. First, *Sullivan* involved common antitrust conduct such that all class members were treated the same way, whereas this case involves diverse conduct across all putative class members. *Sullivan*, 2011 WL 6367740, *13 (3d Cir. Dec. 20, 2011). Second, *Sullivan* involved a settlement class,

24

not a litigation class, a fact upon which the court relied heavily.  *Id*. at \*11 ("[C]oncerns about variations in state law largely dissipate when a court is considering the certification of a settlement class."); \*18 (merits inquiry is "unwarranted in the settlement context since a district court need not envision the form that a trial would take").  Third, with respect to a merits inquiry, the Third Circuit reiterated that a court may inquire whether the elements of asserted claims are capable of proof through common evidence, an inquiry which in this case defeats certification.  *Id*. at \*18.  Fourth, *Sullivan* is distinguishable with respect to injunctive relief because the defendant stipulated to the requested injunction and waived the right to demand proof of the substantive elements of the plaintiffs' claims.  *Id*. at \*7.

      c.    *Adjudicating Plaintiffs' Fraud Claim Requires Highly Individualized Inquiries*.

Certification of Plaintiffs' common law fraud claim is improper because proof of reliance will necessarily be individualized.  A class action "may not be maintained in a purely common law or equitable fraud case since individual questions of law or fact, particularly as to the element of justifiable reliance, will inevitably predominate over common questions of law or fact."  *Crowhorn v. Nationwide Mut. Ins. Co.*, 2002 WL 1767529, at \*9 (Del. Super. Ct. July 10, 2002) (quoting *Gaffin v. Teledyne, Inc.*, 611 A.2d 467 (Del. 1992)).

There is no support for Plaintiffs' argument that reliance may be presumed, Pl. Br. 24 (D.I. 45), regardless of which states' laws the Court applies.  *See Grovatt v. St. Jude Med., Inc. (In re St. Jude Med., Inc.)*, 522 F.3d 836, 838 (8th Cir. 2008) (explaining that under Minnesota law, the reliance element  of a common law fraud claim generally defeats certification); *Crowhorn*, 2002 WL 1767529, at \*9; *Gaffin*, 611 A.2d at 474; *Oliver v. Boston Univ.*, 2000 WL 1091480, at \*10 (Del. Ch. July 18, 2000) ("Delaware law prohibits a common law or equitable fraud claim from being brought by class action."); *see also In re Neurontin Mktg., Sales*

25

*Practices & Prod. Liab. Litig.*, 257 F.R.D. 315, 326 (D. Mass. 2009) (noting federal "courts' general unwillingness to permit a presumption of reliance/causation" to support class certification "in consumer fraud cases"); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008) (refusing to apply a "presumption of reliance" in a purported class action where defendants had conducted a "national marketing campaign" in an allegedly consistent, uniform fashion); *Thorogood v. Sears, Robuck & Co.*, 547 F.3d 742, 748 (7th Cir. 2008) (rejecting "presumption of reliance" as a shortcut to finding predominance in a consumer deception case).

*Spark v. MBNA Corp.*, 178 F.R.D. 431 (D. Del. 1998) is not controlling. The *Spark* plaintiffs brought fraud and misrepresentation claims against MBNA based only upon written promotional credit card offers mailed to the class members. *Id.* at 433-34. Unlike the putative class in this case, the *Spark* class was defined to include only those individuals that received that's ingular type of promotional mailing. *Id.* at 434. The *Spark* court emphasized that the claims stemmed from uniform representations, and it presumed reliance only because most individuals who opened credit card accounts after receipt of the mailing did so because of the "low APR" advertised in the mailing. *Id.* at 435-36. *Spark* also is distinguishable because it was based upon principles from Section 10b-5 of the Securities Exchange Act, an approach that has since been rejected by the Third Circuit. *See Aubrey v. Sanders*, 346 F. App'x 847, 850 (3d Cir. 2009).[7] The other cases cited by Plaintiffs on this issue are 10b-5 cases – even though well-established case law prohibits application of 10b-5 jurisprudence to common law fraud claims. *See Basic Inc. v. Levinson*, 485 U.S. 224, 244 (1988); *Peil v. Speiser*, 806 F.2d 1154, 1163 n.17 (3d Cir. 1986); *Gaffin*, 611 A.2d at 474 (10b-5 presumption of reliance is not available in state

---

[7] The *Spark* case has never been cited in support of the argument that Plaintiffs advance. Moreover, every case to which *Spark* cited for support was based on claims brought under § 10(b) of the Securities Exchange Act.

law fraud claims).[8]

Because there is no presumption of reliance with respect to the common law fraud claim, Plaintiffs will have to prove that each class member relied upon a statement or omission by ING. The mere fact that class members purchased a loan from ING is in no way sufficient to show reliance upon the Rate Renewal feature. The Yargers' purchase decision illustrates this point. The Yargers relied upon alleged oral statements made by their mortgage broker, not by ING. Compl. ¶ 37 (D.I. 36); Ex. 8, at pp. 5-6. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████; J. Yarger

Dep. 175:13-176:21.

    d.    *Plaintiffs' Equitable Claims Necessitate Individualized Factual Inquiries.*

Plaintiffs' claims for promissory estoppel, unjust enrichment, and breach of implied covenant of good faith and fair dealing are similarly ill-suited for class treatment. Reliance is a required element in a promissory estoppel claim. *Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003). Likewise, unjust enrichment requires individual proof of deception. *See Oshana*, 472 F.3d at 515 (class certification properly denied because unjust enrichment claim requires individual proof of deception); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) ("common questions will rarely, if ever, predominate an unjust

---

[8] For example, Plaintiffs cite *Eisenberg v. Gagnon*, 766 F.2d 770, 786–87 (3d Cir. 1985), a securities case in which the plaintiffs received virtually identical written materials. The *Eisenberg* court noted that cases "founded on a ***variety of oral representations*** . . . present a greater obstacle to class treatment." *Id.* (emphasis added). Likewise, in *Easton & Co. v. Mutual Benefit Life Ins. Co.*, 1993 WL 89146, at *6 (D.N.J. Feb. 9, 1993), certification of a common law fraud claim was proper only because of the pendent securities claims, not because of a presumption of reliance.

enrichment claim, the resolution of which turns on individualized facts"). The elements necessary to establish unjust enrichment vary materially from state to state, *see Mazza*, 666 F.3d at 591, so once again this Court would be forced to apply the laws of 51 jurisdictions.

The cases cited by Plaintiffs are distinguishable. *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 73 (D.N.J. 2009), involved a uniform contract, and the class definition eliminated customers who did not take advantage of the service. In *Dal Ponte v. Am. Mortg. Express Corp.*, 2006 WL 2403982, at *2 (D.N.J. Aug. 17, 2006), the class was limited to individuals who paid for a locked-in interest rate, such that the class definition automatically satisfied the "conferred a benefit" element– unlike Plaintiffs' proposed class definition. Finally, *Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232 (W.D. Pa. 2008), involved a single, uniform written manual and a class that was limited to individuals who were overcharged when they were entitled to a discounted rate.

With respect to the covenant of good faith and fair dealing, Plaintiffs must prove that ING's conduct frustrated every class member's reasonable expectations, *see Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010), which necessarily requires an individualized inquiry. Plaintiffs reliance on the *Spark* decision is again misplaced, as it involved a less complex product (credit cards as opposed to mortgage loans) and a uniform mailing to class members (unlike the diverse marketing materials at issue here).

e.    *Damages Cannot Be Determined on a Class-Wide Basis.*

To evaluate potential monetary damages, the Court will have to ascertain whether each class member completed a Rate Renewal, was overcharged based on what they were "promised" and, if so, by how much. For class members who did not Rate Renew, the Court will have to explore whether they would have done so under the originally offered terms and, if so, the damages sustained as a result of not obtaining a Rate Renewal, if any.

Where, as here, liability issues are individualized and damages, if any, are "dependent upon the individual facts of each" class member, predominance is lacking. *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 137 (3d Cir. 2000); *see also Gates v. Rohm and Haas Co.*, 655 F.3d 255, 274 (3d Cir. 2011) (affirming denial of certification based in part on individualized issues related to damages). Rule 23(b)(3) certification "requires a close examination of proof of injury." *Chudner v. Transunion Interactive, Inc.*, 2010 WL 5662966, at *1 n.1 (D. Del. Dec. 15, 2010) (citing *Hydrogen Peroxide*, 552 F.3d at 311). This involves a "'rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove [damages] at trial.'" *Id.* (quoting *Hydrogen Peroxide*, 552 F.3d at 312). Plaintiffs have not met their burden. *See id.* (denying Rule 23(b)(3) because individualized damages issues would predominate over class-wide issues).

Plaintiffs rely on the Declaration of Stephen J. Scherf, CPA to argue that damages can be determined on an objective, class member-by-class member basis in the aggregate. Pls.' Br. 26 (D.I. 45). However, Mr. Scherf simply states that the "documents [he has] seen enabled [him] to prepare a damage model based on objective criteria and information contained within the ING files." (D.I. 51). He does not identify those "objective criteria" or explain how he will be able to apply his formula with evidence common to the class. The Third Circuit has previously held that such declaration testimony is insufficient. *See Newton v. Merrill Lynch, Pierce, Fenner& Smith, Inc.*, 259 F.3d 154, 188 & n.33 (3d Cir. 2001) (rejecting the plaintiffs' "effort to gloss over [the] requirement" of proving damages for each class member through an expert declaration, which did not provide an actual formula and did not explain the expert's methodology); *see also*

*Chudner*, 2010 WL 5662966, at *1 n.1 ("[A] Plaintiff must do more than state a formula that could be used to calculate class-wide damages.").[9]

    3.    <u>Class Treatment Is Not the Superior Method for Adjudicating the Dispute</u>.

If each class member has to litigate numerous and substantial separate issues in order to establish his or her right to recovery, then a class action is not superior. *Zinser v. Accufix Research Inst. Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001). For all of the reasons discussed above with regard to predominance, class treatment is not the superior method for adjudicating this dispute. *See, e.g.*, *Gartin v. S&M NuTec LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007) (where individual claims may involve the laws of other states, superiority requirement is not satisfied).

## CONCLUSION

Because this case involves atypical class representatives, diverse marketing materials, the laws of numerous different jurisdictions, individualized factual inquiries, and individualized damages, class treatment is not proper. Therefore, the Court should deny Plaintiffs' Motion for Class Certification.

February 24, 2012

          MONTGOMERY, McCRACKEN,
          WALKER & RHOADS, LLP

          */s/ R. Montgomery Donaldson*
          R. Montgomery Donaldson (DE I.D. #4367)
          Lisa Z. Brown (DE I.D. #4328)
          1105 N. Market Street, 15th Floor
          Wilmington, DE 19801
          (302) 504-7840
          rdonaldson@mmwr.com

          *Attorneys for Defendant ING Bank, fsb*

---

[9] Here, Mr. Scherf has not even been designated as an expert nor has he submitted an expert report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). Plaintiffs cannot avoid Rule 26's requirements by offering a scant two-page declaration, which is entirely conclusory in nature.

Of Counsel:

Frank A. Hirsch, Jr., Esquire
Matthew P. McGuire, Esquire
Heather Adams, Esquire
Ryan P. Ethridge, Esquire
ALSTON & BIRD LLP
4721 Emperor Blvd., Ste. 400
Durham, NC 27703
(919) 862-2200